**YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 94–555 C.**

United States Court of Federal Claims.

June 22, 1995.

---

Jerry Stouck and Catherine R. Baumer, Spriggs & Hollingsworth, Washington, DC, for plaintiff.

Allen L. Lear, with whom were Asst. Atty. Gen. Frank W. Hunger and Director David M. Cohen, Dept. of Justice, Washington, DC, for defendant.

## OPINION

WIESE, Judge.

Title 42 of the United States Code, section 2297g–1(c) (1988 & Supp. IV 1992), authorizes the Secretary of Energy to collect a special annual assessment from those domestic utilities which, in prior years, had utilized enriched uranium, produced by the Government, as a fuel in the operation of their nuclear-powered electricity generating facilities. The assessment is paid into a fund intended to meet the costs of decontaminating and decommissioning the industrial facilities that the Government used in producing the enriched uranium.

Plaintiff is among the utilities subject to this special assessment; its suit here seeks recovery of a portion of the approximately $3,000,000 it has thus far paid the Govern-

ment.[1] Three theories of recovery are advanced. First, plaintiff maintains that the assessment amounts to a breach of contract, in that it retroactively increases the cost of the Government's uranium enrichment services, thereby violating the "fixed-price" character of the contracts under which those services initially were obtained. Second, even if imposition of the assessment does not amount to a breach of contract, plaintiff claims, it constitutes the deprivation of a contract-based advantage and hence, the taking of a property right. Finally, putting both contract and taking theories aside, plaintiff argues that Congress intended the assessment to apply only to those domestic utilities able to recover the cost involved through their rate base, that is, as a pass-through of a necessary and reasonable cost of fuel. And inasmuch as plaintiff ceased operations in early 1992, some eight months prior to the passage of the legislation authorizing the special assessment, it argues that the assessment represents an unlawful exactitude.

Defendant disagrees with these contentions; it maintains that the assessment represents a legitimate exercise of legislative authority that does not transgress plaintiff's contract rights or implicate the Takings Clause of the Fifth Amendment or violate the terms of the statute authorizing the special assessment.

Both sides have moved for summary judgment supported by written briefs, later supplemented by oral argument. At the conclusion of the argument, heard June 1, 1995, the court issued a tentative ruling in plaintiff's favor and indicated its intention to address the issues more completely in a written decision. This opinion proceeds in accordance with the court's earlier ruling.

### FACTS

Until the shutdown of its operations in early 1992, plaintiff operated as a domestic utility engaged in the wholesale distribution of electrical power generated from nuclear fuels. The company, located in Rowe, Massachusetts, was organized in 1954 by a number of existing electric utility companies to facilitate their joint participation in the then-emerging use of atomic energy as an alternate-source fuel for the generation of electricity. The electricity produced by plaintiff was sold to its shareholder members (the organizing utilities) for redistribution to retail customers, both residential and commercial.

In the conduct of its business, plaintiff purchased uranium enrichment services from the Government. These purchases, which began in 1963, were carried out through successive multi-year contracts between plaintiff and the Atomic Energy Commission (AEC) and successor agencies, including the Department of Energy (DOE). Although the types and terms of the contracts varied over time, their constant feature was a pricing provision which set the charge for the Government's services in accordance with "established Commission pricing policy," that is, at the price in effect at the time the service was provided, subject, however, to a stated maximum amount.

Typical of this contract language was the provision that appeared in the "Agreement For Furnishing Uranium Enrichment Services" which the parties executed on March 9, 1971. Article III of this agreement specified in relevant part that:

> 1. The charges to be paid to the Commission for enriching services provided to the Customer hereunder shall be determined in accordance with the established Commission pricing policy for such services; provided, however, that the unit charge for enriching services during the term of this agreement shall in no event exceed a ceiling charge of $30.00 (subject to possible adjustment [for labor and power costs] pursuant to Section 3 of this article) per Kg unit of separative work for separation of U–235 from U–238, as defined in the established Commission pricing policy.

---

1. The statute authorizes the assessment to be calculated on the basis of all Government-produced enriched uranium utilized by a domestic utility, whether purchased from the Government directly or from secondary market sources. 42 U.S.C. § 2297g–1(c)(1). In this suit, however, plaintiff seeks repayment only of that portion of the annual assessment attributable to its direct purchases from the Government pursuant to contracts entered into in 1963, 1969, and 1971.

The term "established Commission pricing policy" was defined in the contract to mean "any applicable price or charge in effect at the time of performance of any services under this agreement (i) published by the Commission in the Federal Register for material or services subject to this agreement, or (ii) in the absence of such a published figure, determined in accordance with the Commission's Pricing Policy...."

The regulatory agencies involved in managing the Government's uranium enrichment program (the Atomic Energy Commission and successor agencies), either failed to price, or were competitively disabled from pricing, their services high enough to pay for the future cleanup of the radiation contamination at the facilities where the enrichment services were being performed. H.R.Rep. No. 474, 102d Cong., 2d Sess., pt. I, at 142, 144; pt. VIII, at 76, 78 (1992), *reprinted in* 1992 U.S.C.C.A.N.1953, 1965, 1967, 2294, 2296.

This problem was one of many energy-related issues that Congress addressed in the Energy Policy Act of 1992, Pub.L. No. 102–486, 106 Stat. 2776 (the Act). Specifically, Title XI of the Act (106 Stat. 2951) amended the Atomic Energy Act of 1954 to provide, *inter alia,* for the creation of a fund—the Uranium Enrichment Decontamination and Decommissioning Fund—to accumulate, over a fifteen year period, the monies necessary for the cleanup costs of the uranium enrichment plants. (This amendment is now codified at 42 U.S.C. § 2297g.) The Act further provided that contributions to the fund, amounting to $480,000,000 annually, were to come from two sources: up to $150,000,000 annually was to be collected by "special assessment" from domestic utilities; the balance, from general appropriations. The Act also provided that each domestic utility's share of the total annual assessment was to be determined on a per-unit basis (called a separative work unit) representing the measure of that utility's past use of uranium enrichment services provided by the Govern-

ment. (This amendment is now codified at 42 U.S.C. § 2297g–1.)

Following passage of the Act in October 1992, the Department of Energy proceeded to assess plaintiff a share of the annual special assessment. Plaintiff took the position that it was not liable for the assessment because it no longer was an operating utility—the Rowe, Massachusetts facility having been shut down permanently in February 1992—and therefore did not come within the intended reach of the Act. Essentially, it was plaintiff's view that because the Act specifically authorized recovery of the special assessment through a utility's rate base, it necessarily contemplated an assessment that was meant to apply only to operating utilities.[2]

DOE rejected the position urged by plaintiff. The Agency concluded that the Act applied to all utilities that had used government-enriched uranium in their generating facilities without regard to their current operating status. The Agency saw the statutory language relied on by plaintiff as simply an accounting authorization designed to overcome the potential rate-making problems inherent in having present utility consumers bear costs more logically assignable to past consumption.

On August 19, 1994, four days after the rejection of plaintiff's bid for exemption, plaintiff filed suit in this court. As of that date, the Government had collected from plaintiff, pursuant to the authority of 42 U.S.C. § 2297g–1, three annual assessments amounting to approximately $3,000,000.00. Plaintiff seeks recovery of a portion of this sum together with interest, costs and attorneys' fees.

### DISCUSSION

 Our analysis of this case begins with the rule that contracts with the United States, like contracts between private parties, "remain subject to subsequent legisla-

**2.** The argument was founded on the language of 42 U.S.C. § 2297g–1(g), a section titled "Treatment of Assessment." That language reads as follows:

"Any special assessment levied under this section ... shall be deemed a necessary and reasonable current cost of fuel and shall be fully recoverable in rates in all jurisdictions in the same manner as the utility's other fuel cost."

tion by the presiding sovereign." *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 147, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982). As the Court explained in *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), " 'sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain unless surrendered in unmistakable terms.' " *Id.* at 52, 106 S.Ct. at 2397 (quoting *Merrion,* 455 U.S. at 148, 102 S.Ct. at 907). Thus, "one who wishes to obtain a contractual right against the sovereign that is immune from the effect of future changes in law must make sure that the contract confers such a right in unmistakable terms." *Transohio Sav. Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598, 618 (D.C.Cir.1992) (quoting *Western Fuels–Utah, Inc. v. Lujan,* 895 F.2d 780, 789 (D.C.Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 24 (1990)).

But even where a contract does not contain language securing protection from the potentially disruptive effects of subsequent legislation, exercise of the sovereign power does not proceed unchecked. That power, the Court has also declared, may not be relied upon to "take away property already acquired under the operation of [a contract], or to deprive [a] corporation of the fruits actually reduced to possession ˙ of contracts lawfully made." *Bowen,* 477 U.S. at 55, 106 S.Ct. at 2398 (quoting *Sinking–Fund Cases,* 99 U.S. 700, 720, 25 L.Ed. 496, 25 L.Ed. 504 (1878)). And, as the *Bowen* decision further points out, in other decisions the Court has held "that Congress does not have the power to repudiate its own debts, which constitute 'property' to the lender, simply in order to save money." *Id.* Cited in support of this proposition are the decisions in *Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935) and *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934).

■ There are, then, recognized limits upon Congress' power to enact legislation that impairs rights created under contracts with the Government. The question is whether those limits have been exceeded here. Is this a case in which the Government's actions amount to a deprivation of property "already acquired"? The answer is yes.

The several contracts between plaintiff and the United States were essentially requirements-type contracts under the terms of which plaintiff had the right to order uranium enrichment services from the Government at published market prices that were not to exceed a stated per-unit amount. Significantly, those contracts contained no provision permitting the Government to reprice its services if, upon a post-performance evaluation, the prices charged were found to have been too low. Nor would such a provision have been called for. It was the AEC's mandate from the start to price its services so as to assure "reasonable compensation to the Government." Act of August 26, 1964, Pub.L. No. 88–489, 78 Stat. 602, 606 (1964) (formerly codified at 42 U.S.C. § 2201(v)(B) (1964); current version at 42 U.S.C. § 2201(v) (1988 & Supp. IV 1992)). Subsequent legislation made clear that this pricing standard was intended to accomplish a "recovery of the Government's costs over a reasonable period of time." Act of December 14, 1970, Pub.L. No. 91–560, 84 Stat. 1472, 1474 (1970) (formerly codified at 42 U.S.C. § 2201(v)(B) (1970); current version at 42 U.S.C. § 2201(v) (1988 & Supp. IV 1992)). In short, there was no want of authority in the administering agency to price the Government's services so as to recapture, over time, all costs associated with the delivery of those services.

Given this statutory background and the fixed-price character of the Government's undertaking, plaintiff was justified in concluding that, upon payment to the Government for services ordered, the transactions involved would become final. That conclusion is founded on the principle that one who undertakes to perform at a fixed price thereby assumes the burden of all unanticipated costs. *United States v. Spearin,* 248 U.S. 132, 135–36, 39 S.Ct. 59, 60–61, 63 L.Ed. 166 (1918). Simply put, the Government bargained away the right to demand additional compensation from plaintiff (for the same

services) to meet risks not foreseen at the time the contracts were made. Correspondingly, the economic benefit which plaintiff gained by virtue of the Government's promise, being a benefit enforceable at law, thus became a property interest that fell beyond the reach of the Government's power to take away. *Lynch*, 292 U.S. at 579, 54 S.Ct. at 843–844 ("Rights against the United States arising out of a contract with it are protected by the Fifth Amendment.")

The Government endeavors to avoid this result by claiming that the special assessment represents an exercise of the sovereign's taxing power and, as such, cannot be abridged in favor of private contract rights. We do not accept this contention. The argument would have some force if we were dealing with a general tax that fell on all utilities alike. That, however, is not our case. Rather, this special assessment reaches only those utility companies that previously had contracted with the Government for the purchase of uranium enrichment services, and it taxes them according to the number of separative work units purchased. Clearly, then, the assessment is an add-on to the price previously paid to the Government. Thus, by imposing the assessment in the manner here described, the Government dishonors the very promise it had earlier made: that the price to be charged for its services would not exceed the contract-stated maximum. Legislation so plainly directed at undoing a contract liability previously assumed by the Government is an impermissible exercise of sovereign power. "The doctrine of 'public and general' 'sovereign acts', laid down in *Horowitz v. United States*, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925), does not relieve the Government from liability where it has specially undertaken to perform the very act from which it later seeks to be excused." *Freedman v. United States*, 162 Ct.Cl. 390, 402, 320 F.2d 359, 366 (1963).

Indeed, the Government's actions are tantamount to an abrogation of contract rights akin to that declared unlawful in *Perry* and *Lynch*. In *Perry* the Court struck down, as

beyond congressional power, a joint resolution of the Congress that included language repealing the Government's obligation to repay its bondholders in gold coin. And in *Lynch*, the Court found a similar want of authority in Congress' attempted repeal of the Government's obligation to pay in accordance with the terms of a war-risk insurance policy. Though, in each case, the action taken by the Government was prompted by concerns for the Nation's economy and the need to save money, this reason was held insufficient to sanction the extinguishment of vested contract rights. The reasoning went as follows:

> No doubt there was in March, 1933, great need of economy. In the administration of all government business economy had become urgent because of lessened revenues and the heavy obligations to be issued in the hope of relieving widespread distress. Congress was free to reduce gratuities deemed excessive. But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation. "The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen." *Sinking–Fund Cases*, 99 U.S. 700, 719.

*Lynch v. United States*, 292 U.S. at 580, 54 S.Ct. at 844.

During the oral argument of the case, counsel for the Government sought to distinguish *Perry* and *Lynch* on the ground that there the content of the promises undertaken by the Government was spelled out in statute [3] whereas here the substance of the commitment was determined by an Executive agency. In counsel's view, only the former can give rise to a vested right; the latter, it is argued, remains subject to the risk of

---

**3.** The statutory authorizations underlying the obligations addressed in *Perry* and *Lynch* are, respectively, Act of September 24, 1917, ch. 56, 40 Stat. 288 (authorizing issuance of war bonds) and Act of October 6, 1917, ch. 105, 40 Stat. 398 (establishing Bureau of War Risk Insurance).

impairment by subsequent legislation unless secured against that possibility by specific protective language.

■ We do not accept this distinction. A contract with the United States is not of lesser dignity because its terms originate in Executive judgment rather than legislative prescription. Commitments made by the Executive, when authorized by statute, are no less sovereign in character than commitments made by the Legislature itself. It is not the source of the Government's promise that determines the existence of a vested right, but the extent to which the bargain between the parties has been carried out. A contract that has been performed to the extent of giving the Government all that it bargained for creates a vested right in the other party to the return performance promised by the Government. *Texas Pacific Coal & Oil Co. v. Honolulu Oil Corp.*, 241 F.2d 920, 922 (5th Cir.1957).

■ Similarly, when a contract between citizen and Government is fully performed on each side, the resulting exchange of values amounts in substance to an exchange of property interests. The interests acquired become vested interests—the "fruits actually reduced to possession of contracts lawfully made," *Sinking–Fund Cases*, 99 U.S. at 720, that are entitled to protection under the Takings Clause of the Fifth Amendment. *Lynch v. United States*, 292 U.S. at 579, 54 S.Ct. at 843–844.

### CONCLUSION

For the reasons stated, the court concludes that, as applied to plaintiff, the special assessment amounts, in part, to an unlawful exaction because it violates the Government's earlier commitments to supply enriched uranium at contract prices not to exceed a stated amount and thus improperly diminishes the value of the property (the economic advantage) that plaintiff acquired pursuant to those commitments. Plaintiff is entitled to the benefit of its bargain; hence, those portions of the annual assessments that relate to plaintiff's 1963, 1969, and 1971 contract purchases of enriched uranium from the Government must be refunded together with interest. The amount of the judgment to be entered shall be based on a stipulation to be filed by the parties within 30 days from the date of this opinion.[4]

---

4. In view of the conclusion reached, we deem it unnecessary to address plaintiff's separate contention that the special assessment was intended only to apply to operating utilities.