YANKEE ATOMIC ELECTRIC
COMPANY, Plaintiff/Cross–
Appellant,

v.

The UNITED STATES, Defendant–
Appellant.

Nos. 96–5021, 96–5025.

United States Court of Appeals,
Federal Circuit.

May 6, 1997.

Jerry Stouck, Spriggs & Hollingsworth, Washington, D.C., argued for plaintiff/cross-appellant. Of counsel on the brief were Catherine R. Baumer and David R. Lipson.

Douglas Letter, Attorney, Appellate Staff, Civil Division, Department of Justice, Washington, D.C., argued for defendant-appellant. With him on the brief were Frank W. Hunger, Assistant Attorney General, and Allen L. Lear, Attorney, Commercial Litigation Branch.

Before MAYER, LOURIE, and CLEVENGER, Circuit Judges.

Opinion of the court filed by Circuit Judge CLEVENGER. Dissenting opinion filed by Circuit Judge MAYER.

CLEVENGER, Circuit Judge.

This case requires us to decide whether, in light of prior contracts specifying the price to be paid for uranium enrichment services, the Government may impose upon domestic utilities a special assessment to aid in funding the clean-up costs associated with the facilities that provided those enrichment services.

The United States appeals the decision of the United States Court of Federal Claims, *Yankee Atomic Electric Co. v. United States,* 33 Fed. Cl. 580 (1995), granting summary judgment to Yankee Atomic Electric Company (Yankee Atomic). In that decision, the court determined that the assessment imposed upon Yankee Atomic to fund clean-up costs constitutes an unlawful exaction because it violates the Government's earlier contractual agreements to supply enriched uranium at fixed prices. We conclude that the assessment was lawful and therefore reverse.

## I

As both parties acknowledge, the salient facts are not in dispute. Yankee Atomic was organized in 1954 by a number of existing utility companies in an effort to participate in the use of atomic energy as an alternative-source fuel for generating electricity. Yankee Atomic produced electricity using nuclear fuels and sold the resulting electricity to the organizing utilities, which, in turn, sold it to retail customers.

Yankee Atomic's operations required an enriched form of uranium, which was produced by separating useful isotopes of uranium from other isotopes. Beginning in 1963, Yankee Atomic purchased the uranium enrichment (or separation) services from the Government through a series of contracts. Those services were provided at enrichment plants operated first by the Atomic Energy Commission (AEC or Commission) and later by the Energy Research and Development Administration and the Department of Energy (all collectively DOE). Although these contracts varied somewhat from one to another, they each stated that the price paid by Yankee Atomic for the enrichment services would be based on "established Commission pricing policy," which was defined as the price in effect at the time the service was provided. There is no dispute that the Government fulfilled its contractual obligation to provide the enrichment services, and that Yankee Atomic fulfilled its obligation to pay the price in effect at that time.

In the late 1980s, Congress determined that it had to restructure the Government's uranium enrichment services in order to remain competitive with enrichment services provided by other parties. It did so by creating a new, for-profit, governmental corporation called the United States Enrichment Corporation. At the same time, Congress realized that there would be large costs associated with decontaminating and decommissioning the facilities that had previously been used to provide enrichment services.

The Department of Energy estimated that the total cost of this clean up could exceed $20 billion over 40 years, which amounted to about $500 million per year, indexed to inflation. H.R.Rep. No. 474, pt. VIII, at 77 (1992), *reprinted in* 1992 U.S.C.C.A.N. 2282, 2295. Because this decontamination and decommissioning fiscal problem was not recognized until the 1980s, the prices charged in the Government's past uranium enrichment contracts had not accounted for the problem.

This clean-up problem was one of many energy-related issues that Congress addressed in the Energy Policy Act of 1992 (Energy Policy Act or Act). The Act establishes an account to be known as the Uranium Enrichment Decontamination and Decommissioning Fund (Fund), which, over a 15–year period, would accumulate the monies required to clean up the old uranium enrichment plants. The Act provides that the annual deposits of $480 million (adjusted for inflation), will come from two sources: (i) up to $150 million is to be collected as a special assessment from domestic utility companies; and (ii) the balance, at least $330 million, is to come from public funds appropriated by Congress.

The Act further provides that each utility is responsible for a pro-rata share of the total annual assessment based on the percentage of uranium enrichment work units it previously purchased from the DOE relative to the total number of work units previously produced by the DOE. The Act states that a utility is considered to have purchased a work unit from the DOE if the work unit was originally produced by DOE, even if the utility actually purchased it from another source. Similarly, a utility is not considered to have purchased a work unit from the DOE if it resold that work unit to another utility.[1] In sum, the Act imposes the assessment upon whichever utility company eventually uses the enrichment services.

---

**1.** These provisions were designed to take into account the secondary market that existed for uranium enrichment services, wherein some utilities purchased uranium enrichment work units from the Government and resold them to other utilities. Yankee Atomic purchased a portion of its uranium enrichment services through this secondary market, but does not assert any breach of contract, taking, or unlawful exaction claim concerning its monetary liability under the Act for those purchases.

Following the passage of the Act in October 1992, the DOE sought to assess Yankee Atomic's share of the annual special assessment. Yankee Atomic responded by arguing to the DOE that it should be exempted from the assessment because its facilities had shut down before passage of the Act. When the DOE rejected this argument, Yankee Atomic paid approximately $3 million pursuant to three annual assessments, and filed a lawsuit in the Court of Federal Claims seeking recovery of those payments.

## II

Upon cross-motions for summary judgment, the Court of Federal Claims ruled in favor of Yankee Atomic. The court rejected the Government's contention that the special assessment was a lawful exercise of Congress's taxing power under the sovereign acts doctrine. The court explained that although the sovereign acts doctrine would have some force if the case involved a general tax that fell on all utilities alike, it had no impact in the present case which involves an assessment that "reaches only those utility companies that previously had contracted with the Government for the purchase of uranium enrichment services." Accordingly, the court viewed the special assessment as a unilateral retroactive increase in the price previously charged by the Government for its uranium enrichment services.

The court explained that such a retroactive price increase would constitute an unlawful exaction in view of the prior contracts between the Government and Yankee Atomic. Because those prior contracts specified a fixed price for the uranium enrichment services, the "economic benefit which [Yankee Atomic] gained by virtue of the Government's promise, being a benefit enforceable at law, thus became a property interest that fell beyond the reach of the Government's power to take away." 33 Fed. Cl. at 585.

Based on this conclusion, the court granted Yankee Atomic's motion for summary judg-

ment without addressing Yankee Atomic's argument that it was exempt from the assessment because its facilities had closed before passage of the Act. We review the Government's appeal, and Yankee Atomic's cross-appeal, from the judgment of the Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3) (1994).

## III

The decision of the Court of Federal Claims is driven by its characterization of the special assessment as a retroactive price increase rather than an exercise of the sovereign's taxing power, and the parties' dispute over this characterization frames the dispositive issue of this appeal.

The Government's principal argument is that the special assessment is entirely distinct from the prior contracts between the DOE and utility companies such as Yankee Atomic. The Government notes that those earlier contracts concerned uranium enrichment, whereas this assessment concerns decontamination and decommissioning. As a result, the Government asserts that the assessment cannot constitute a breach of those earlier contracts unless those contracts contained an express provision that precluded the Government from imposing an assessment to fund decontamination and decommissioning costs.

Yankee Atomic disagrees with the Government's characterization of the assessment and contends that it is directly related to the earlier contracts. Yankee Atomic contends that the fixed-price nature of those contracts expressly limited its obligation to the price already paid, and shifted the risk of any additional costs (including decontamination and decommissioning costs) onto the Government. Yankee Atomic argues that the assessment breaches those contracts by, in effect, retroactively increasing the price that it must pay for the previously supplied uranium enrichment services.[2]

---

2. Throughout its briefs, Yankee Atomic contends that the special assessment constitutes a breach of its contracts with the Government. Technically, however, this does not appear to be a case involving a breach of contract. Typically, a con-

tract breach occurs while the contract is being performed, whereas the contracts in the present case have been fully performed by both parties. This appears to have been the view of the Court of Federal Claims, as indicated by the notable

Resolution of this disputed characterization requires us to consider and apply two related bodies of law: the sovereign acts doctrine and the unmistakability doctrine. We consider each in turn.

## IV

The sovereign acts doctrine stems from a series of decisions by the Court of Claims, and was first recognized by the United States Supreme Court in *Horowitz v. United States,* 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925). In that case, Horowitz submitted a bid to buy certain Habutai silk offered for sale by the Government. The Government agreed that Horowitz would be given the opportunity to re-sell the silk before paying the purchase price, and agreed to ship the silk within a day or two after shipping instructions were given. *Id.* at 459, 45 S.Ct. at 344. Horowitz sold the silk to a silk company, paid the balance of the purchase price, and requested that the silk be shipped to the silk company at once. Because of a governmental embargo placed on the shipment of silk by freight, however, the silk was not shipped for several weeks. By the time it arrived, the price of silk had dropped significantly, and the consignee refused to accept delivery. As a result, Horowitz was forced to sell the silk at a loss. *Id.* at 460, 45 S.Ct. at 344.

Horowitz sued the United States, contending that the embargo breached the valid contract he had for sale and shipment of the silk. The United States Supreme Court rejected this argument because "[i]t has long

been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Id.* at 461, 45 S.Ct. at 344. The Court adopted the reasoning of the Court of Claims:

The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. *Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons.* ... In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.

*Id.* (quoting *Jones v. United States,* 1 Ct.Cl. 383, 384 (1865)) (emphasis added).[3]

The Supreme Court recently discussed *Horowitz,* and the sovereign acts doctrine in general, in *United States v. Winstar Corp.,* ── U.S. ──, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).[4] In *Winstar,* the plurali-

---

absence in its opinion of any reference to breach of contract. This distinction does not affect our decision, however. Regardless of whether the situation is characterized as a breach of contract, an unlawful taking, or an unlawful exaction, the arguments stem from Yankee Atomic's prior contracts with the Government.

**3.** The Court of Claims expressed this same philosophy in *O'Neill v. United States,* 231 Ct.Cl. 823, 826 (1982), as follows:

From its earliest days ... application of the sovereign act[s] doctrine has proceeded from the recognition that in governing the country, the Government's actions, otherwise legal, will occasionally incidentally impair the performance of contracts. Were those contracts exclusively between private parties, the party

hurt by such governing action could not claim compensation from the other party *for the governing action.* Given the large number of contracts the Government enters, *its* contracts will sometimes be affected by those same governing acts. The policy underlying the sovereign act[s] doctrine is that in those circumstances, *the Government in its contracting role, like its private counterpart, should not incur liability for its act done in the governing role.*

**4.** The sovereign acts doctrine has also been cited in several other cases since *Horowitz. See, e.g., Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 145–46, 102 S.Ct. 894, 905–06, 71 L.Ed.2d 21 (1982) (discussing that the petitioners confuse the Tribe's role as commercial partner with its role as sovereign); *Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir.1990) (explaining

ty explained that the doctrine is designed to distinguish between the Government's twin roles as contractor and sovereign. *Id.* at ——, 116 S.Ct. at 2463. When the Government enters into a contract, "its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Id.* at —— ——, 116 S.Ct. at 2464–65. The Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties. Such action would give the Government-as-contractor powers that private contracting parties lack.

▮▮▮ On the other hand, the plurality explained, the Government-as-sovereign must remain free to exercise its powers. For this reason, the early Court of Claims cases "thought it 'grave error' to suppose that 'general enactments of Congress are to be construed as evasions of [the plaintiff's] particular contract.'" *Id.* at ——, 116 S.Ct. at 2464 (quoting *Deming v. United States,* 1 Ct.Cl. 190, 191, 1865 WL 2004 (1865)). The sovereign acts doctrine attempts to "balance[ ] the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor."[5] *Id.* at ——, 116 S.Ct. at 2465. Thus, it is not a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts.

Under the sovereign acts doctrine, therefore, we must decide whether the Government, in enacting the relevant provisions of the Energy Policy Act of 1992, was (i) acting for the purpose of retroactively increasing the price of its earlier contracts with Yankee Atomic (*i.e.,* the legislation was passed for the benefit of the Government-as-contractor)

or (ii) acting for the purpose of solving the problem of decontamination and decommissioning of uranium enrichment facilities (*i.e.,* the legislation was passed for the benefit of the public). We conclude it was the latter.

As explained above, we must begin by examining the scope of the Energy Policy Act; only then can we determine whether the Act is designed with the purpose of affecting or altering the Government's prior contracts. The Energy Policy Act requires contribution to the Fund from any domestic utility that purchased separative work units from the DOE before the Act's passage. 42 U.S.C. § 2297g–1(c) (1994). Importantly, however, the scope of the Act is not coincident with those domestic utilities that had previously entered into contracts with the DOE for uranium enrichment services, because the Act *does not* require contribution from a utility that contracted with the DOE if that utility re-sold the purchased services to another utility. *See* 42 U.S.C. § 2297g–1(c)(2). In contrast, the Act *does* require contribution from any utility that did not have a contract with the DOE but nonetheless benefited from the DOE's services by purchasing through the secondary market. *See* 42 U.S.C. § 2297g–1(c)(1). Thus, some utility/Government contracts are not embraced by the Act, while some purchases from private entities are covered. The key is whether the purchaser was the ultimate beneficiary of the DOE's services.

▮▮▮ The reach of the Act, therefore, makes clear that Congress was not focused on a retroactive increase in the price of the Government's prior contractual agreements. Rather than targeting those utility companies that had prior contracts with the Government, the Act targets whichever utility eventually used and benefited from the DOE's enrichment services. Congress's main purpose was to spread the costs of a problem that it realized only after the con-

that the Uranium Mill Tailings Radiation Control Act was a sovereign act undertaken for the public good and, therefore, could not form the basis for a party's breach of contract claim).

**5.** The concurring and dissenting justices agreed with this general statement of the doctrine. Un-

der the facts of *Winstar, see infra* section IV.A, only three justices concluded that the congressional act was not a sovereign one (*i.e.,* the act was attributable to the Government-as-contractor). The remaining justices either viewed the act as a sovereign one or decided the case on another basis.

tracts had been performed. *Cf. Atlas Corp.,* 895 F.2d at 748 (noting that the dangers and clean-up costs associated with uranium milling operations were not fully recognized until the late 1970s). It did so by dividing the costs between: (i) the Government, which was responsible for at least $330 million per year to be raised through general appropriations, and (ii) those domestic utilities that benefited from the DOE's uranium enrichment services. Any impact that this approach may have on those utilities with which the Government had prior contracts is "merely incidental to the accomplishment of a broader governmental objective." *See Winstar,* —— U.S. at ——, 116 S.Ct. at 2466.

■■■ In characterizing the essence of the Act, Yankee Atomic focuses only on the provisions that impact those utilities that contracted with the Government and that themselves used the enrichment services. While it is true that Yankee Atomic has no quarrel with the Government over its liability on consumption of enrichment services supplied by nongovernmental entities through the secondary market, that fact cannot render irrelevant the Act's provisions that reach even those utilities that did not contract with the Government. When construing an act of Congress, and especially when determining the essential characteristic of a particular statute, we must observe and understand the statute as a whole. *See Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its

object and policy."); *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591–92, 7 L.Ed.2d 492 (1962) ("We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act."); *In re Nantucket, Inc.,* 677 F.2d 95, 98 (C.C.P.A.1982) ("Each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole, and it is not proper to confine interpretation to the one section to be construed." (citation omitted)). Statutory provisions that are relevant, or as here, controlling, to our interpretation cannot be ignored simply because they are not dispositive to the facts before us.

Similarly, the opinion of the Court of Federal Claims seems to have been mistaken in reasoning: "The [sovereign acts doctrine] argument would have some force if we were dealing with a general tax that fell on all utilities alike. That, however, is not our case. Rather, *this special assessment reaches only those utility companies that previously had contracted with the Government* for the purchase of uranium enrichment services." 33 Fed. Cl. at 585 (emphasis added). As explained above, the special assessment does not reach only those utility companies that previously contracted with the Government; it also reaches those utilities that purchased the services through the secondary market but had *no* contracts with the Government. Ironically, then, the assessment appears to be very similar to what the Court of Federal Claims thought it was not: a general tax that falls proportionally on all utilities that benefited from the DOE's uranium enrichment services.[6]

---

6. To the extent that the Energy Policy Act is designed to spread the costs of a societal problem, it is not unlike other instances where Congress has enacted legislation to spread societal costs. One such example involves the costs of cleaning up hazardous waste under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 et. seq. (1994). *See, e.g., United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726 (8th Cir.1986). The defendants in those lawsuits have frequently challenged the retroactive application of CERCLA as a violation of their due process rights and as an unconstitutional taking. The courts, however, have rejected those arguments. *See id.* at 734 (rejecting due process challenge because "Congress acted in a

rational manner in imposing liability for the cost of cleaning up such sites upon those parties who created and profited from the sites and upon the chemical industry as a whole").

Yankee Atomic contends that the CERCLA cases, and others like them, are inapposite because they involve the impact of legislation on private parties and therefore do not implicate the Government's self-interest. *See Perry v. United States,* 294 U.S. 330, 350–51, 55 S.Ct. 432, 434–35, 79 L.Ed. 912 (1935). We cite the CERCLA cases not for their insight as to Congress's motives in enacting the Energy Policy Act, but rather for their general proposition that the costs of large, unrecognized societal problems are frequently spread among those who benefited from the source of the problem.

The broad reach of the Energy Policy Act also distinguishes the present case from two cases upon which Yankee Atomic and the Court of Federal Claims relied: *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), and *Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935).

In *Lynch,* the plaintiffs had entered into agreements with the United States for War Risk Insurance and had paid the prescribed monthly premiums. 292 U.S. at 576, 54 S.Ct. at 842. Congress subsequently enacted the Economy Act which included a clause stating: "All laws granting or pertaining to yearly renewable term insurance are hereby repealed." *Id.* at 575, 54 S.Ct. at 842. The Supreme Court held the legislation unlawful without discussing the sovereign acts doctrine, which is not surprising given that the clause was clearly directed to abrogating past war risk insurance contracts for reasons of economy. As the Court stated: "No doubt there was in March, 1933, great need of economy.... But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States." *Id.* at 580, 54 S.Ct. at 844.

In *Perry,* the plaintiff owned a $10,000 government bond which, when redeemed, required the United States to pay in "gold coin of the present standard of value." 294 U.S. at 346–47, 55 S.Ct. at 433. Congress later passed a joint resolution which stated that payment of obligations in gold was against public policy and, therefore, all obligations shall be discharged by payment in currency that is legal tender. *Id.* at 349, 55 S.Ct. at 434. The enactment specifically stated that "provisions for payment in gold, 'contained in any law authorizing obligations to be issued by or under authority of the United States,' were repealed." *Id.* Based on this clear expression of an intention to abrogate past contracts, the Court again held the act unlawful without discussing the sovereign acts doctrine.

In sum, *Lynch* and *Perry* both involved situations where the congressional act made clear that its purpose was, at least in part, to abrogate past public contracts. The Energy Policy Act, in contrast, reveals no such purpose of targeting past contracts. Instead, the Act taxes all beneficiaries of the DOE's uranium enrichment services.

Given the focus of the relevant provisions of the Energy Policy Act, we conclude that it constitutes a general exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services. This conclusion does not end our inquiry, however. We must further consider whether the Government, by contract with Yankee Atomic, has surrendered the right to exercise this sovereign power "in terms which admit of no other reasonable interpretation." *Merrion,* 455 U.S. at 148, 102 S.Ct. at 907. This requires us to consider and apply the unmistakability doctrine.

## V

As the Supreme Court plurality recently explained in *Winstar,* the modern unmistakability doctrine "marks the point of intersection between two fundamental constitutional concepts." *Winstar,* —— U.S. at ——, 116 S.Ct. at 2453. One concept, which developed in England, is that of parliamentary sovereignty. This concept posits that because the legislature has absolute authority and acknowledges no superior power, it cannot be bound by acts of a prior legislature. *Id.* The other concept, which developed in the United States, is that legislative power may be limited under certain circumstances. Unlike the absolute power enjoyed by the Parliament in England, the legislature in the United States is "subject to the overriding dictates of the Constitution and the obligations that it authorizes." *Id.* at —— ——, 116 S.Ct. at 2453–54. One such limitation is that embodied in the Contracts Clause, which prohibits a state from passing any law that impairs the obligation of contracts. *See* U.S. Const., Art. I, § 10, cl. 1. Although the Contracts Clause does not apply to acts of the United States, "it is clear that the National Government has some capacity to make agreements binding future Congresses by creating vested rights.... The extent of that capacity, to be sure, remains somewhat obscure." *Winstar,* ——

U.S. at ——, 116 S.Ct. at 2455 (citations omitted).

■ The modern unmistakability doctrine is a canon of construction that attempts to balance these two somewhat competing concepts by allowing the Government to make agreements that bind future Congresses, but only if those contracts contain an unmistakable promise. Thus, the plurality in *Winstar* summarized the almost 160–year history of the unmistakability doctrine as follows:

[A] contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power.

*Id.* at ——, 116 S.Ct. at 2456.[7]

In *Winstar,* the justices were divided as to whether or not the unmistakability doctrine was even applicable, given the facts of that case. Therefore, we next address the issue of whether the doctrine is applicable under the facts of the present case.

### A

The plurality of justices in *Winstar* decided that the unmistakability doctrine was not applicable. *Winstar* involved the fallout from the crisis involving the savings and loan industry in the late 1970s and early 1980s. The Government induced healthy thrifts to merge with ailing ones by agreeing to provide favorable regulatory treatment, which would allow the healthy thrifts to count towards their capitalization requirements certain "supervisory goodwill" generated by the mergers. *Winstar,* —— U.S. at —— – ——, 116 S.Ct. at 2442–43. This scheme, however, was ultimately unsuccessful in resolving the thrift industry crisis. As a result, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), which required that all thrift institutions no longer use "supervisory goodwill" to meet their capitalization requirements. This immediately caused several thrifts to fall out of compliance with capitalization requirements, thereby making them subject to seizure by thrift regulators. *Id.* at ——, 116 S.Ct. at 2446. The thrifts filed suit claiming breach of contract.

After reciting the history of the unmistakability doctrine, the *Winstar* plurality stated:

The cases extending back into the 19th-century thus stand for a rule that applies when the Government is subject either to a claim that its contract has surrendered a sovereign power (e.g., to tax or control navigation), or to a claim that cannot be recognized without creating an exemption from the exercise of such a power.... *The application of the doctrine thus turns on whether enforcement of the contractual obligation would block the exercise of a sovereign power of the Government.*

*Id.* at —— – ——, 116 S.Ct. at 2456–57 (footnote omitted; emphasis added). The plurality held that the doctrine was inapplicable because the contracts with the thrifts did not preclude the Government from later exercising its sovereign powers. Instead, the contracts merely shifted the risk of loss onto the Government, thereby requiring it to "indemnify its contracting partners against financial losses arising from regulatory change." *Id.* at ——, 116 S.Ct. at 2461.

Five justices disagreed with the plurality's conclusion that the unmistakability doctrine was not available simply because the contracts were risk-shifting agreements. The

---

7. The remaining justices in *Winstar* essentially agreed with this formulation of the doctrine, although they disagreed with its application to the facts of that case. The two dissenting justices viewed the doctrine to embody the notion that "a waiver of sovereign authority will not be implied, but instead must be surrendered in unmistakable terms." *Id.* at ——, 116 S.Ct. at 2480 (Rehnquist, J., dissenting). The three concurring justices stated the doctrine as follows:

[I]t is reasonable to presume (unless the opposite clearly appears) that the sovereign does not promise that none of its multifarious sovereign acts, needful for the public good, will incidentally disable it or the other party from performing one of the promised acts.... Governments do not ordinarily agree to curtail their sovereign or legislative powers, and contracts must be interpreted in a common-sense way against that background understanding. *Id.* at ——, 116 S.Ct. at 2477 (Scalia, J., concurring).

three concurring justices pointed out that the plurality's approach was inconsistent with precedent, which had "not made the availability of these sovereign defenses (as opposed to their validity on the merits) depend upon the nature of the contract at issue." *Id.* at ——, 116 S.Ct. at 2476. Moreover, "[v]irtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance." *Id.* Despite this difference, these three justices concurred because they believed that the contracts contained unmistakable promises to continue the favorable regulatory treatment. *Id.* at —— – ——, 116 S.Ct. at 2477–78. The two dissenting justices concluded that the doctrine applied and that the contracts did not contain an unmistakable promise against future regulatory change.

■■ Based on the reasoning contained in the *Winstar* opinions, we conclude that the unmistakability doctrine applies in the present case. This conclusion respects the views of the five justices who stated that the application of the doctrine is unrelated to the nature of the underlying contracts. In addition, our conclusion is in harmony with the views of the plurality justices. To be sure, the contracts at issue in the present case may be viewed as risk-shifting agreements, similar to those that the *Winstar* plurality found not to implicate the unmistakability doctrine. As mentioned above, the contracts at issue are fixed-price contracts, and the Supreme Court has held that "[w]here one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918). Similarly, our predecessor court has stated that "the [seller] in a fixed-price contract assumes the risk of unexpected costs. In firm fixed-price contracts, risks fall on the [seller], and the [seller] takes account of this through his prices." *ITT Arctic Servs., Inc. v. United States,* 207 Ct.Cl. 743, 524 F.2d 680, 691 (1975) (citations omitted).

Importantly, however, the plurality also expressly stated that application of the un-

mistakability doctrine turns on whether enforcement of the contractual obligation would effectively block the exercise of a sovereign power of the Government. *Winstar,* —— U.S. at —— – ——, 116 S.Ct. at 2457–58. As explained above, the assessment at issue in the present case is a general, sovereign act. Although Yankee Atomic seeks money damages, its argument would effectively block the exercise of this sovereign power to tax, for if Yankee Atomic were to prevail, the Government would be required to refund the entire amount assessed. This is akin to a tax rebate, which even the plurality seemed to recognize as a block to the exercise of sovereign power. *See id.* at ——, 116 S.Ct. at 2458 ("Granting a rebate, like enjoining enforcement, would simply block the exercise of the taxing power.").

B

■■ Having decided that the unmistakability doctrine applies, we next address the merits of the arguments on that issue. This requires us to decide whether the contracts between Yankee Atomic and the Government unmistakably precluded the Government from subsequently exercising its sovereign power to assess a tax. We conclude that no such promise existed in the contracts.

We begin by noting that none of the contracts expressly states that Yankee Atomic will be immune from any future assessments made by the Government upon the industry as a whole. Yankee Atomic acknowledges the lack of any such express statement, but instead relies on the fixed-price nature of the contract. Yankee Atomic argues that "[t]he fixed-price contract terms are hardly implicit, and they *forbid* a future price increase." Although the contracts include fixed-price terms, we must determine whether those terms unmistakably encompassed future taxes or assessments.

■■ To determine the scope of those fixed price terms, we look to the language of the contracts. Although the language of the several contracts varies somewhat, the contract executed on March 9, 1971, entitled "Agreement For Furnishing Uranium En-

richment Services" is representative. Article III of that agreement provides, in part:

1. The charges to be paid to the Commission for enriching services provided to the Customer hereunder shall be determined in accordance with the established Commission pricing policy for such services; provided, however, that the unit charge for enriching services during the term of this agreement shall in no event exceed a ceiling charge of $30.00 (subject to possible adjustment [for labor and power costs] pursuant to Section 3 of this article) per Kg unit of separative work for separation of U–235 from U–238, as defined in the established Commission pricing policy.

From examining the contracts, we decide that the fixed-price terms of the contract do not constitute an unmistakable promise on behalf of the Government that it will not impose a general assessment upon all utility companies that benefited from the DOE's uranium enrichment services. The language of the contract is directed at the prices charged for providing enriched uranium to Yankee Atomic, and not to any decontamination or decommissioning costs which may subsequently arise. Thus, the contract states that "[t]he charges [are] to be paid to the Commission *for enriching services provided*," and sets a ceiling price of $30 per Kg unit "for separation of U–235 from U–238."

The Government complied with this provision by providing the enriched uranium at the agreed-upon price. At that point, the contract was fully performed by both parties. This gave Yankee Atomic a vested contract right which would then bar the Government from deliberately attempting to charge more for performance of those contracts. As explained above in the sovereign acts doctrine discussion, however, the subsequent assessment is not a deliberate retroactive increase in the price of those contracts. Instead, it is the Government's way of spreading the costs of the later discovered decontamination and decommissioning problem on all utilities that benefited from the Government's service,

whether or not those services were acquired by contract from the Government.

The opinion of the Court of Federal Claims is not clear as to whether or not it discerned an unmistakable promise that barred the subsequent special assessment. On the one hand, after reciting several unmistakability doctrine cases, the court stated: *"But even where a contract does not contain language securing protection from the potentially disruptive effects of subsequent legislation,* exercise of the sovereign power does not proceed unchecked." 33 Fed. Cl. at 584. The underscored portion of this statement indicates that the court viewed the contracts as containing no unmistakable promise that precluded the Government from later imposing an assessment.

■ On the other hand, the court's opinion can be read to indicate that it found such an unmistakable promise. The court explained that the congressional acts required the AEC to charge prices that assured reasonable compensation to the Government, which was later defined as recovery of the Government's costs over a reasonable period of time. Based on these legislative mandates, the court stated: "[i]n short, there was no want of authority in the administering agency to price the Government's services so as to recapture, over time, all costs associated with the delivery of those services." 33 Fed. Cl. at 584. This indicates that the court implied an unmistakable promise from legislative mandates. To the extent that the Court of Federal Claims implied an unmistakable promise from the legislative acts, we conclude it erred. Put simply, a specific promise implied from general legislative acts is not an unmistakable one.

■ Therefore, we conclude that the contracts between Yankee Atomic and the Government did not include an unmistakable promise that precluded the Government from later imposing an assessment upon all domestic utilities that employed the DOE's uranium enrichment services.[8]

---

8. Our conclusion on this point also resolves Yankee Atomic's takings argument. Because the contracts did not contain an unmistakable promise against a future assessment, Yankee Atomic

had no property right (via a vested contract right) which was subsequently taken by the assessment. At most, Yankee Atomic has a vested right to be immune from later attempts to retro-

## VI

■ Yankee Atomic also contends that even if we should rule against it on its contractual arguments, it should nonetheless prevail on its statutory argument. Yankee Atomic argues that the Energy Policy Act applies only to "domestic utilities," and that the meaning of that term is provided by the following language:

> Any special assessment levied under this section on domestic utilities for the decontamination and decommissioning of the Department's gaseous diffusion enrichment facilities shall be deemed a necessary and reasonable current cost of fuel and shall be fully recoverable in rates in all jurisdictions in the same manner as the utility's other fuel cost.

42 U.S.C. § 2297g–1(g). Yankee Atomic argues that this language plainly indicates that "domestic utility" encompasses only those utilities that are currently generating and selling electricity. Because Yankee Atomic ceased operation eight months before passage of the Act, it is not a "domestic utility." As a result, Yankee Atomic asserts that the entire assessment, including that levied on Yankee Atomic's purchase in the secondary market, would constitute an unlawful exaction. We disagree with this argument.

The plain language of the Energy Policy Act explains which utilities are covered by its scope. The Act clearly states that "[t]he Secretary shall collect a special assessment from domestic utilities." 42 U.S.C. § 2297g–1(c). The Act further states that a utility is responsible for contribution to the Decontamination and Decommissioning Fund if it purchased uranium enrichment services from the DOE, either directly or indirectly, but utility company. 42 U.S.C. §§ 2297g–1(c)(1), (2). Thus, the plain language of the statute sets the parameters of its scope. Because Yankee Atomic purchased uranium enrich-

ment services from the DOE, both directly and indirectly, it falls within the Act's scope.

The provision cited by Yankee Atomic, § 2297g–1(g), does not contradict this plain meaning. That provision merely addresses the issue of how the special assessment should be treated in determining utility rates. By defining the assessment as a current cost of fuel, Congress clears the path for the domestic utilities to pass through the assessment to current customers. This avoids any complications from the Federal Energy Regulatory Commission, which has ruled that although customers can be charged for current fuel costs, they cannot be charged for certain prior costs. *See, e.g., Northern States Power Co.,* 58 FERC ¶ 61,-119 (Feb. 6, 1992). Section 2297g–1(g) does not, however, *sub silentio* create an exception which takes certain utilities out of the reach of the assessment.

Therefore, we conclude that Yankee Atomic is not exempt from the assessment by virtue of its nonoperating status at the time the Act was passed. The Act plainly defines the scope of the assessment, and Yankee Atomic has not cited any contrary intention by Congress.

## VII

In conclusion, the provision of the Energy Policy Act which imposes the special assessment is a sovereign act because it is designed to spread the costs associated with the decontamination and decommissioning over all domestic utilities that used the DOE's uranium enrichment services, rather than targeting only those utilities that had contracts with the Government. Moreover, the contracts between Yankee Atomic and the Government did not contain an unmistakable promise which precluded the Government from exercising this sovereign power. Finally, Yankee Atomic is not exempt from the assessment by virtue of the fact that it ceased operations before the Act's passage.

---

actively increase the prices charged. This right has not been taken because, as explained in the sovereign acts discussion, the assessment is a general, sovereign act rather than a retroactive price increase. For the same reason, *Lynch* and *Perry* are inapposite. In each of those cases, the Government's action directly abrogated prior

vested contractual rights. *See Winstar,* ——— U.S. at ———, 116 S.Ct. at 2455 (stating that "it is clear that the National Government has some capacity to make agreements binding future Congresses by creating vested rights," and citing *Perry* and *Lynch* ).

Accordingly, the judgment of the Court of Federal Claims is reversed.

No costs.

*REVERSED.*

MAYER, Circuit Judge, dissenting.

More than a century ago, the Supreme Court held that the government cannot deprive a party with which it contracts "of the fruits actually reduced to possession of contracts lawfully made." *Sinking Fund Cases,* 99 U.S. 700, 720, 25 L.Ed. 496 (1879); *see also Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 55, 106 S.Ct. 2390, 2398, 91 L.Ed.2d 35 (1986). In levying the special assessments required by 42 U.S.C. § 2297g–1 against Yankee Atomic Electric Company (Yankee), the government improperly diminished the value of Yankee's contractual "fruits." The Court of Federal Claims held that this was an "unlawful exaction," and I agree. I would affirm.

The parties do not dispute that the contracts at issue were fixed-price contracts. "Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918); *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.1996) ("Because fixed-price contracts do not contain a method for varying the price of the contract in the event of unforeseen circumstances, they assign the risk to the [seller] that the actual cost of performance will be higher than the price of the contract."). As the seller of uranium enrichment services, the government bore the risk of any unforeseen difficulties or increased costs that might arise out of its performance of the contracts.

The parties also agree that the contracts were fully and satisfactorily performed. Once a contract is completed, the contractual relationship ends and there is no privity between the parties. *M. Bianchi of Cal. v. Perry,* 31 F.3d 1163, 1167–68 (Fed.Cir.1994); *John J. Kirlin, Inc. v. United States,* 827 F.2d 1538, 1541 (Fed.Cir.1987). Consequently, Yankee cannot prevail on its claim that the government breached the contracts at issue years after they were finished. *See Mulholland v. United States,* 175 Ct.Cl. 832, 361 F.2d 237, 239–40 (1966) (at the latest, a breach of contract claim accrues when the contract is completed); *cf. Henke v. United States,* 60 F.3d 795, 799–800 (Fed.Cir.1995).

Contracts, however, are property, "whether the obligor be a private individual, a municipality, a State, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment" of the United States Constitution. *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934); *see also Bowen,* 477 U.S. at 52, 106 S.Ct. at 2396–97 (the government "has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights"); *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1003, 104 S.Ct. 2862, 2873, 81 L.Ed.2d 815 (1984) ("[V]alid contracts are property within meaning of the Taking Clause."); *Thorpe v. Housing Auth. of Durham,* 393 U.S. 268, 278 n. 31, 89 S.Ct. 518, 524 n. 31, 21 L.Ed.2d 474 (1969). The Fifth Amendment prohibits the federal government from depriving a person of property "without due process of law" and from taking private property "without just compensation." U.S. Const. amend. V; *Lynch,* 292 U.S. at 579, 54 S.Ct. at 843; *cf. Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 163–64, 101 S.Ct. 446, 452, 66 L.Ed.2d 358 (1980) (where state collected a service charge, subsequently-imposed fee for the same service was an unconstitutional taking).

The government does not contend that its contracts with Yankee were invalid. So, there can be no doubt that once Yankee's contracts had been satisfactorily performed, its rights under those contracts were fully-vested property rights. Consequently, the government cannot deprive Yankee of the benefits of those contracts. *See Sinking Fund Cases,* 99 U.S. at 720.

To ascertain Yankee's vested property rights, we must look to the contracts themselves. The bargain struck between the government and Yankee was simple. The government, through the Atomic Energy

Commission and its successor agencies, was to provide uranium enrichment or separation services for Yankee. In return, Yankee was to pay a fixed price per separative work unit, the common measure by which uranium enrichment services are sold. Between 1963 and 1983, Yankee purchased approximately 804,000 separative work units at prices ranging from less than $26 to more than $149 per unit. Because of the fixed-price nature of these contracts, Yankee was entitled to pay no more than the agreed-upon price. The government, on the other hand, was assigned the risk for any unforeseen difficulties that might arise or the risk that actual performance costs would be higher than the contract price.

The sole basis upon which Congress imposed the special assessments which Yankee seeks to recover is that Yankee had purchased uranium enrichment services from the government. These assessments were calculated based on the percentage of the total separative work units produced by the government which Yankee had purchased directly. This is tantamount to a retroactive price increase. It levies a charge on Yankee solely because it had previously purchased enrichment services from the government. But those purchases were made via fixed-price contracts. The assessment effectively requires Yankee to pay for the additional costs the government incurred as a result of performing uranium enrichment services; the very same costs for which the government assumed the risk. Thus, the government retroactively abrogated the essence of the contracts at issue. "But Congress [is] without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure would be not the practice of economy, but an act of repudiation." *Perry,* 294 U.S. at 352–53, 55 S.Ct. at 436.

It is of no moment that the reason for the assessment is to relieve the government from shouldering entirely the unforeseen costs incurred in providing those services, from which Yankee had benefited. Yankee fully paid the government for those benefits, and as the seller of the enrichment services, the government bore the burden for any unforeseen costs. The Fifth Amendment "was designed to bar Government from forcing some people alone to bear public burdens which . . . should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960); *cf. United States v. Winstar Corp.,* —— U.S. ——, ——, 116 S.Ct. 2432, 2459, 135 L.Ed.2d 964 (1996) (the government may not "simply shift costs of legislation onto its contractual partners who are adversely affected by the change in the law, when the Government has assumed the risk of such change").

Nor is it of any great import that the assessment is levied on some utilities that did not contract directly with the government. First, that is not the case before us. Yankee seeks to recover only assessments based on its direct purchases from the government. It does not challenge charges based on secondary market purchases, which, according to the government at argument, constitute just 15% of the total assessments. Moreover, the same argument, that legislation was not targeted solely at those with whom the government had contracted, was made by the government and rejected by the Court in *Winstar.* "Legislation can almost always be written in a formally general way, and the want of an identified target is not much security when a measure's impact nonetheless falls substantially upon the Government's contracting partners." —— U.S. at ——, 116 S.Ct. at 2468. The government concedes that 85% of the special assessment falls on utilities that had procured enrichment services directly from the government. Clearly then, the assessment's impact falls substantially on the government's contracting partners. That a small fraction of others who indirectly purchased enrichment services from the government also must pay the assessment does not mask its true identity as a retroactive price increase.

The government invokes the familiar sovereign acts and unmistakability doctrines in support of its position that the special assessment did not abrogate Yankee's vested contract rights. Neither shields the government.

The sovereign acts doctrine provides that "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 344, 69 L.Ed. 736 (1925). "[T]he essential point [of the doctrine is] to put the Government in the same position that it would have enjoyed as a private contractor." *Winstar*, —— U.S. at ——, 116 S.Ct. at 2463. This doctrine is wholly inapplicable. Properly understood, it is a government defense to breach of contract and other contractor claims that a governmental act adversely affected contract performance. But this is not a breach of contract case. Nor did Congress' enactment of the special assessment obstruct performance of the contracts, as contemplated by *Horowitz*. The contracts were fully and successfully performed by both parties. But even assuming the doctrine applied, it would not insulate the government from liability because the impact of the special assessment falls so substantially and directly on Yankee and the government's other contractors. *See Winstar*, —— U.S. at ——, 116 S.Ct. at 2469 ("[T]he extent to which [the legislation there at issue] relieved the Government of its own contractual obligations precludes a finding that the statute is a 'public and general' act for purposes of the sovereign acts defense.").

The unmistakability doctrine, on the other hand, is simply a "canon of contract construction," *Winstar*, —— U.S. at ——, 116 S.Ct. at 2448, which says that "a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an act of Congress)," *id.* at ——, 116 S.Ct. at 2456. Its application "turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power," such as the power to tax. *Id.* at ——, 116 S.Ct. at 2457. But this doctrine too is inapplicable. It is not enforcement of a "con-

tractual obligation," per se, that is at issue. Rather, Yankee seeks reimbursement for the improper abrogation of its vested property rights, which happened to arise out of the completed contracts. That is, it seeks money damages for the government's deprivation "of the fruits actually reduced to possession" of the contracts at issue. *See Sinking Fund Cases*, 99 U.S. at 720.

Even assuming, for the sake of argument, the unmistakability doctrine applied, it adds little. The parties agree that the contracts, out of which Yankee's property rights arose, had fixed prices and that the government bore the risk of unforeseen costs that might arise. They merely disagree about the legal consequences that flow from this interpretation. But Yankee needed no more than the fixed-price contract terms to insulate itself from a post-performance price hike. It did not need an additional, second promise not to have the contract price increased after completion. *See Winstar*, —— U.S. at ——, 116 S.Ct. at 2461 (there is "no need for an unmistakably clear 'second promise'"); *id.* at ——, 116 S.Ct. at 2477 (Scalia, Kennedy, Thomas, JJ., concurring) (there need be no *"further* promise not to go back on the promise" made).

That is not to say that Yankee would be immune from every assessment or tax relating to decontaminating and decommissioning the government enrichment facilities, no matter how general or broad its application, solely because it had a fixed-price contract. But where, as here, the impact of the tax falls so substantially and directly on Yankee and the government's other contracting partners, it amounts to a retroactive price increase, which cannot stand.

When the government improperly exacts or takes one's money "'in contravention of the Constitution, a statute, or a regulation,'" an illegal exaction has occurred, and the payor is entitled to recoupment. *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–73 (Fed.Cir.1996); *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1007 (1967). In other words, "an illegal exaction has occurred when 'the Government has the citizen's money in its pocket.'" *Aer-*

*olineas Argentinas,* 77 F.3d at 1573 (quoting *Clapp v. United States,* 127 Ct.Cl. 505, 512, 117 F.Supp. 576, 580 (1954)). The government has Yankee's money in its pocket. It illegally exacted that money in contravention of Yankee's rights under the Fifth Amendment. Yankee is entitled to recover it.