ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| GEMS Environmental Management | ) | ASBCA Nos. 61737, 61831, 62322 |
| Services | ) | 62323, 62324, 62325 |
| | ) | 62326, 62327, 62328 |
| | ) | 62329, 62330, 62331 |
| | ) | 62332, 62333, 62785 |
| | ) | 62786, 62787 |
| | ) | |
| Under Contract No. W91238-15-D-0014 | ) | |

APPEARANCE FOR THE APPELLANT: Casey J. McKinnon, Esq.
Cohen Seglias Pallas Greenhall & Furman PC
Washington, DC

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
Engineer Chief Trial Attorney
Alfred L. Faustino, Esq.
Kevin A. Cullen, Esq.
Colby K. Stewart, Esq.
Amanda R. Fuller, Esq.
Schuyler Lystad, Esq.
Engineer Trial Attorneys
U.S. Army Engineer District, Sacramento

OPINION BY ADMINISTRATIVE JUDGE PROUTY
ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

The parties in this construction contract dispute have crossed-moved[1] for partial summary judgment over several issues mostly involving contract interpretation and three more purely legal matters: installation-wide changes in security requirements during contract performance; whether a contractor is entitled to costs for responding to a request for proposal that the government later decided was unnecessary; and the availability of interest as a remedy for retainage of progress payments. These cross-motions do not address all of the issues before us in these appeals, nevertheless, their consideration had the potential to either resolve some particular appeals or at least narrow the factual issues that the parties will need to prove at trial. For the

---

[1] To be more specific, the government moved for partial summary judgment on seven claims before us while GEMS only cross-moved on five of these claims, while opposing the government's motion on the remaining two.

reasons to be explained below, we hereby grant the government's motion for partial summary judgment in part and completely deny appellant, GEMS Environmental Management's (GEMS), cross-motion for partial summary judgment. As will be seen, the portions of the government's motion which we deny are those portions for which the government has not provided sufficient evidence at this point to support judgment in its favor.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTIONS

I. The Project and General Contract Terms

On September 29, 2015, the United States Army Corps of Engineers (the Corps) awarded to GEMS the above-captioned multiple award task order contract (the contract) to perform design-build construction services at the Military Ocean Terminal Concord (MOTCO) in California (*see* ASBCA No. 61831 R4, tab 4). On the same day it also issued to GEMS its first task order (TO) on the contract (*see* ASBCA No. 61737 R4, tab 3).

The purpose of this TO was for GEMS to design and build a one-story General Purpose Maintenance Shop (the GPMS) and a one-story Storage Building at MOTCO (*see* ASBCA No. 61831 R4, tab 8 at GOVTO 1521 (¶ 1.1), GOVTO 1522 (¶2.1))[2]. The solicitation for the TO (also referred to herein as the RFP) further explained the purpose of the GPMS, which was to provide indoor facilities for the repair and maintenance of over-sized top-pick spreaders known as "super-stackers," which had previously needed to be worked on in the outdoors (*id*. at GOVTO 1523).

Though the RFP included conceptual drawings, those were not intended to represent the entire design of the building or even, necessarily, its complete orientation. Thus, Contract Specification § 01 10 10 ¶ 6.7.1 provides in relevant part:

> Preferred building location and orientation of the new facility is shown on C-120. The final site design shall be determined by the contractor meeting the minimum provisions of all applicable references indicated in these RFP documents and with the final approval of the contracting officer. . .

(ASBCA No. 61831 R4, tab 8 at GOVTO 1542)

---

[2] "GOVTO ___" is the Bates number for items in the respective Rule 4 files, except that we delete unnecessary zeroes. For example, a page Bates stamped as "GOVTO 000050" will be referenced herein as "GOVTO 50."

The point of the conceptual drawings in the RFP, paragraph 1.5 of this specification stated, was to "indicate the general location of this facility, its approximate maximum size, and other system parameters that represent functional relationships of the project program" (ASBCA No. 61831 R4, tab 8 at GOVTO 1522). Paragraph 1.6 of the specification continued:

> The government's conceptual facility and site design provided in the RFP documents illustrates intent and functional relationships and does not indicate all necessary construction requirements or components. The written RFP describes associated technical, performance and system requirements. The Contractor is responsible for the complete Project design . . .

(*Id.*)

As explained in the RFP, the project was required to conform to the MOTCO Installation Design Guide (ASBCA No. 61831 R4, tab 8 at GOVTO 1521 (¶ 1.3)). It was also required to be designed and constructed "in accordance with the criteria contained herein and using industry standard materials and efficient practices" (*id.*).

The contract incorporated by reference Federal Acquisition Regulation (FAR) clause 52.236-21, Specifications and Drawings for Construction (FEB 1997) (*see* ASBCA No. 61831 R4, tab 4 at GOVTO 699). FAR 52.236-21 is a standard contract clause that provides in relevant part that, "[a]nything mentioned in the specifications and not shown in the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In the case of a difference between the drawings and specifications, the specifications shall govern." FAR 52.236-21(a).[3]

Another standard clause in the contract was included in paragraph 3 of "Supplemental Contract Requirements," apparently attached to the RFP. That paragraph provided:

> **3. Authorities.** Only a warranted Contracting Officer (either PCO or ACO) acting within their delegated limits has the authority to issue modifications or otherwise change the terms and conditions of this contract. If an

---

[3] The contract also incorporated by reference FAR 52.236-21 Alt I, Specifications and Drawings for Construction (Feb 1997) Alternative (APR 2004), (*see* ASBCA No. 61831 R4, tab 4 at GOVTO 699), but that FAR provision does not affect the issue before us today.

individual other than the Contracting Officer attempts to make changes to the terms and conditions of this contract you shall not proceed with the change and shall immediately notify the contracting officer.

(Gov't mot. at Ex. B)[4]

II. Facts Related to Two Claims Regarding a Driveway

A. Contract Specifications and Drawings Related to Parking and a Driveway

Section 6.7 of the task order specifications includes two[5] salient provisions to the driveway dispute. They are:

6.7.3 **Parking Area.** 10 new parking stalls, including 1 ADA compliant space, shall be provided to accommodate facility personnel. Parking areas are required to comply with the requirements of *UFC 4-010-01*.

6.7.4 **Vehicle Access**. One driveway entrance shall be provided on 'A' Street. See sheet C-120.

(*See* ASBCA No. 61831 R4, tab 8 at GOVTO 1542)

The contract drawings also indicate a driveway. The upper right hand side of Sheet C-120 (referenced in section 6.7.4 directly above), depicts an unlabeled driveway connecting "A" Street to the labeled parking area and to the "concrete hardstand and access" as may be seen below (*see* ASBCA No. 61831 R4, tab 8 at GOVTO 2011):

---

[4] We refer to the government's motion for partial summary judgment as "gov't mot." GEMS's cross-motion and opposition is "app. mot.," with the parties' respective reply briefs, "gov't reply" and "app. reply."

[5] The first provision, regarding the parking area, might not appear, at first blush, to be material to the driveway issue. Bear with us.



The driveway (still unlabeled) is also in the schematics for the landscape demolition plan in Sheet LD-101 (*id*. at GOVTO 2013) and the general landscape plan in Sheet L-101 (*id*. at GOVTO 2014). Sheet L-101, in fact, indicates that the driveway will be made of "concrete" (*id*.). Computer-generated site renderings of the project site also include the driveway connecting it to "A" Street, though the driveway appears to be blacktop of some sort in these depictions, rather than concrete (*id.* at GOVTO 2017 (sheet L-901); *id*. at GOVTO 2018 (sheet L-902)).

But there was a pre-existing driveway in what appears to be the same location connecting the project site to "A" Street, as may be seen in the site demolition plan, sheet C-101, below (ASBCA Nos. 62322-33 R4, tab 17.3 at GOVTO 9034):

5



B. The Dispute Over the Driveway

At the initial design charette meeting[6] on January 11, 2016, the issue of the driveway arose. According to the minutes of the charette:

> Circulation was discussion [sic.]. There was concern that the RFP entrance off the north is not large enough, especially as it pertains to turning movements, for a commercial tractor trailer. The design-build team will analyze on-site circulation using Autoturn.

(ASBCA No. 61831 R4, tab 9 at GOVTO 2024)[7]

---

[6] A "design charette" is a collaborative design meeting involving contractor team members and client representatives.

[7] Although it was not noted by the parties in the motions before us, this apparently remained an issue for some time. The meeting minutes of the 65% design review, held on July 26, 2016, noted as one of three action items:

> Tetra Tech will develop autoturn model to demonstrate turning movement into the existing driveway from A Street

6

On January 25, 2016, the Corps issued RFP 0001 under the TO, requesting a cost proposal to perform a number of "design changes" (ASBCA No. 61737 R4, tab 7 at GOVTO 222). One such change noted in RFP 0001 was:

> k. A-Street Entrance - Provide all design, materials, labor, equipment, and supervision to widen the A Street entrance to accommodate 1-way commercial tractor-trailer access.

(*Id*. at GOVTO 223). The parties have not cited any response to RFP 0001 with respect to the driveway.

In any event, the pavement plan for the 100% design drawings, issued on November 23, 2016, does not include a portion of the driveway connecting it to "A" Street (*see* ASBCA Nos. 62322-33 R4, tab 17.3 at GOVTO 9039). Although we do not discern a means of measuring from the record before us exactly how much of the driveway is omitted, the government has alleged in correspondence with GEMS that it is approximately 17 feet (*see* ASBCA No. 61737 R4, tab 13 at GOVTO 251), which looks about right to us and has not been disputed by GEMS in any portion of the record that we have seen or in any of its filings here.

Going along with GEMS's apparent supposition that it was not responsible under the contract for the omitted portion of the driveway, on December 12, 2016, the Corps issued RFP-0003, asking GEMS to price the driveway work that was then considered additional (*see* ASBCA No. 61737 R4, tab 9). GEMS responded with a proposal on January 16, 2017 (*see* ASBCA No. 61737 R4, tab 11 at GOVTO 241).

After GEMS submitted a revised proposal on March 29, 2017 in response to questions from the Corps (*see* ASBCA No. 61737 R4, tab 11 at GOVTO 236-37), things came off the rails. Mr. Richard Donnelly, the Corps Office Engineer, told GEMS in an email that the increase in price caused him to "step back" and review the circumstances relating to the driveway problem and to "clarify . . . who owns it" (*id*. at GOVTO 235). Mr. Donnelly, in fact, concluded that the driveway issue was the responsibility of GEMS, not the government as he had earlier believed (*id*. at GOVTO 236). Not surprisingly, GEMS begged to differ, and sent a letter to the contracting officer (CO), dated April 12, 2017, explaining its position that Mr. Donnelly was incorrect (*id*. at GOVTO 233-34). After a meeting between the parties on April 19, 2017 to discuss the issue (*see* ASBCA No. 61737 R4, tab 12 at GOVTO 251)

---

of a tractor trailer combination with a flatbed trailer for the TEREX Superstacker.

(ASBCA No. 61831 R4, tab 11 at GOVTO 2097)

GEMS sent a follow-up letter to the CO the same day, elaborating on its previous arguments (*see* ASBCA No. 61737 R4, tab 12).

In a response to this letter from GEMS, the CO sent a letter on April 27, 2017 which argued that the written specifications plainly required a driveway entrance to be provided by the contractor and that the lack of its reference in RFP drawing C-120 was overcome by the contractual clause which specified that items contained in the specifications, but not the drawings or vice-versa, should be considered to be in both and that, in any event, if there were an inconsistency, the specifications would govern. This letter further argued that the discrepancy in the materials for the driveway between RFP sheet L101 (which specified the use of Portland Cement Concrete) and RFP sheets L-901 and L-902 (which specified the use of Asphalt Cement Concrete), combined with drawing C-120's failure to include a driveway should have compelled GEMS to make an inquiry to the government, which it did not do. To be sure, the government conceded, a government reviewer erred when that person initially agreed that the driveway was beyond the scope of the contract, which led to the issuance of RFP-0003 for the supposedly extra work on the driveway. Nevertheless, the government contended, this mistake did not change the fact that, at the end, the driveway work was the responsibility of GEMS. RFP-0001 was not mentioned in this letter. (ASBCA No. 61737 R4, tab 13 at GOVTO 251-52)

C. The REA and Claim Over the Driveway Design

On September 7, 2017, GEMS submitted a letter to the CO that it captioned as a Request for Equitable Adjustment (the design REA) in which it sought $137,638.26 in costs for designing the "A" Street entrance and updating the construction drawings. It also sought a compensable delay of 334 days. (ASBCA No. 61737 R4, tab 4 at GOVTO 17-21) In a letter dated October 5, 2017, the CO denied relief to GEMS for the design REA and directed GEMS to submit a written request for a final decision to the CO if it was dissatisfied with the decision and wished to pursue a claim (ASBCA No. 61737 R4, tab 16). On January 26, 2018, GEMS submitted a certified "Claim for Equitable Adjustment" to the CO seeking the same relief as the design REA (ASBCA No. 61737 R4, tab 4). This claim was largely denied by the CO in a written decision dated May 11, 2018, although the decision granted GEMS $11,226.60 based upon its costs incurred in providing the March 29, 2017 cost proposal for the entrance to the Corps (ASBCA No. 61737 R4, tab 2).

GEMS submitted a timely appeal to the Board which we docketed as ASBCA No. 61737.

8

D. A Salient Undisputed Fact About the Delay Days in the Driveway Design Claim

GEMS's scheduling expert testified that GEMS should be entitled to zero days of delay pursuant by to the driveway design claim (*see* gov't mot. at Ex. A at 15:14-20 (deposition of Kurt Musser)). GEMS does not make any argument or provide any evidence to dispute this fact.

E. The Driveway Construction Claim

On June 10, 2020, more than two years after the CO denied its claim seeking costs for design of the driveway, GEMS submitted a certified claim seeking $251,882.92 and 35 days of delay for costs and delays associated with the actual construction of the disputed portions of the driveway as opposed to the design costs sought in the earlier claim (ASBCA Nos. 62785-87 R4, tab 3). The government denied this claim in full in a CO final decision dated February 16, 2021[8] (ASBCA Nos. 62785-87 R4, tab 2). GEMS submitted a timely appeal to the Board, which we docketed as ASBCA No. 62785.

F. A Salient Undisputed Fact About the Delay Days in the Driveway Construction Claim

As in the driveway design claim, GEMS's scheduling expert testified that GEMS should be entitled to zero days of delay pursuant by to the driveway construction claim (*see* gov't mot. at Ex. A at 15:21-16:4 (deposition of Kurt Musser)). Again, GEMS advances no argument and provides no evidence to dispute this fact.

III. Facts Related to the Security Access Claim

A. Contract Terms Relating to Access to the Installation

Attachment 01 to the Solicitation Amendment's[9] Statement of Work included Paragraph ¶ 1.8. Contractor Access to Installation & Security. In relevant part, this provision provided that:

---

[8] This decision also addressed two other claims submitted by GEMS at about the same time (ASBCA Nos. 62785-87 R4, tab 2)

[9] The government refers to this as "the solicitation" in its motion (*see* gov't mot. at 19) though it is entitled as "Solicitation Amendment" in the Rule 4 file. We will refer to it as the solicitation amendment here, but suspect it makes no difference because the solicitation, as amended, is the solicitation, and GEMS has made no argument that this presents a problem.

> Access to base requires that Contractor employees and all
> subcontractors to [sic.] voluntarily submit personal
> information per Appendix 02 and Appendix 03 (e.g., name,
> address, DOB, DL#, social security number, etc.) when
> applying for a base Identification Card or temporary access
> pass, which typically takes 72 hours. The Contractor shall
> plan in advance accordingly to obtain all required
> information to obtain access to MOTCO.
>
> . . .
>
> In the event the contractor, his/her employees, or
> subcontractors fail to adhere to the Installation security
> provision, the Installation has the authority to deny access
> to the work site to that employee or subcontractor without
> an extension of time being granted to the Contractor.

(ASBCA Nos. 62322-33 R4, tab 140 at GOVTO 18872)

Appendix 02 to the solicitation amendment was a copy of "MOTCO Form 190-3-R" which was entitled "MOTCO Access Request." The form was dated December 2014 and stated, "This form must be submitted a "MINIMUM" of 72 hours prior to access." (ASBCA Nos. 62322-33 R4, tab 139 at GOVTO 18869)

B. The MOTCO Pass and ID Office Changes its Procedures

In an email dated January 31, 2017, the Corps informed GEMS that it should use a new base access request form, which it had attached (*see* ASBCA Nos. 62322-33 R4, tab 138 at GOVTO 17437). The form and its instructions were, in fact, attached to the email (*see id*. at GOVTO 17439-51) and required that access requests be submitted to the MOTCO Pass and ID Office no less than seven working days prior to being needed (*id*. at GOVTO 17440; *see also id*. at GOVTO 17451 (MOTCO Form 190-3-R dated August 2016)). The instructions for filling out the MOTCO Form 190-3 included a header that stated: "MOTCO FORM 190-3 (Required for ALL visitors)" (*id*. at GOVTO 17441).

About a year later, on January 4, 2018, the Corps sent an email to GEMS informing it that it had been told by the MOTCO Pass and ID Office that "DIBS"[10]

---

[10] "DIBS" cards are not defined in the record as cited by the parties, but the government avers in its motion that "DIBS" should, in fact, be "DBIDS," which is short for Defense Biometrics Identification System (gov't mot. at 18). GEMS does not dispute this, and it appears to us to be correct.

cards were being phased out upon their expiration and being replaced with paper passes good for only 30 days (*see* ASBCA Nos. 62322-33 R4, tab 138 at GOVTO 17405). The DBIDS cards had apparently been good for six months, according to GEMS's claim (*id*. at GOVTO 17328) and agreed with by the CO in the CO's final decision on GEMS's claim (*see* ASBCA Nos. 62322-33 R4, tab 2 at GOVTO 492).

### C. GEMS Submits a Claim on Security Access

On January 25, 2019, GEMS submitted a claim to the CO alleging that the extension of time to obtain passes (the changes from 72 hours mentioned in the solicitation to seven days and then later to seven working days) and the phasing out of the DBIDS system, which effectively required a visit to the MOTCO Pass and ID Office once a month, rather than once every six months, took up a substantial amount of its employees' time, summing up to $65,453.46 worth at the relevant employees' burdened pay rates. (ASBCA Nos. 62322-33 R4, tab 138 at GOVTO 17326-28) GEMS argued that it was entitled to this money pursuant to the contract's Changes clause and because the government's changing of the requirements constituted a breach of the implicit duty of good faith and fair dealing (*id*. at GOVTO 17328-29). GEMS also asserted that it needed to regularly make phone calls and perform other follow-up tasks because of additional problems with the Corps that delayed issuance of the passes (*see, e.g.*, ASBCA Nos. 62322-33 R4, tab 138 at GOVTO 17327, ¶ 10).

On December 18, 2109, the CO denied GEMS's claim in full (ASBCA Nos. 62322-33 R4, tab 2 at GOVTO 490-92). GEMS submitted a timely appeal to the Board, which we docketed as ASBCA No. 62331.

### IV. Facts Related to the Dispute Over the Weed Geofabric RFP

On June 18, 2018, the CO's representative, David Haven, sent a letter to GEMS requesting that, pursuant to the contract's Changes clause, it submit a cost proposal for installing weed geofabric in particular area as delineated in a previous communication (ASBCA Nos. 62322-33 R4, tab 126). The letter stated that, consistent with prior communications from the Corps, the contract did not require this geofabric, but that the customer had requested it (*id*. at GOVTO 16657). As GEMS notes (*see* app. mot. at 6), this letter included the word, "shall" in at least two places: first, when it described the detail required of the proposal, it stated that, "a complete itemized breakdown *shall* be submitted in sufficient detail to permit an analysis of all material, labor, equipment, subcontract, overhead cost . . . and profit as required by DFARS 252.236-7000, 'Modification Proposal – Price Breakdown.' It *shall* include all work involved in the modification" (ASBCA Nos. 62322-33 R4, tab 126 at GOVTO 16657) (emphases added). It also requested that the response be submitted by GEMS by July 3, 2018 "to avoid unnecessary delays" (*id*.) The letter closed by stating that, "[i]n the event of cancellation or unsatisfactory negotiations, the Government shall assume no obligation

11

for payment for any expense incurred by you in the preparation of your proposal" (*id.* at GOVTO 16658).

GEMS responded to *Mr. Haven's* letter[11] on June 27, 2018 with a cost proposal reflecting an $18,783.95 price and an extra two days to complete the project (ASBCA Nos. 62322-33 R4, tab 124 at GOVTO 16451). We emphasized "Mr. Haven" above, because in response to the government's motion, GEMS alleged that there was a version of this letter signed "and sent" by the Administrative Contracting Officer (ACO), Mr. David Franzen on the same date (app. mot. at 6 (citing app. R4 supp., tabs 8-9)). The government vehemently denies that the letter from Mr. Franzen was ever sent to GEMS, making a point that GEMS provided no evidence that it ever received that letter from Mr. Franzen, implying that it was drafted but not actually sent to GEMS and only came to light to GEMS after it was provided by the government in discovery (gov't reply at 18-19). GEMS is careful to change the subject in its reply brief, but re-states that there are two separate versions of the letter in the record (app. reply at 2-3). We are not amused by this dexterity and would prefer GEMS's counsel to have come clean and conceded directly that there was no evidence that the letter from Mr. Franzen was actually "sent" to it, as GEMS represented in its opening brief. Indeed, we examined the two copies of the letter provided by GEMS and looked at the digital signature: Mr. Franzen's digital signature was dated the 28th of June, 2018 (app. R4 supp., tab 8 at 2) – the day after GEMS had responded to the weed geofabric RFP. Hence, the only evidence provided by GEMS in support of its quasi-withdrawn allegation that the ACO had issued this RFP and sent it to GEMS – a version of the letter with Mr. Franzen's signature on it whose origins are never demonstrated – reflects that it was created *after* GEMS's response. Thus, the undisputed material fact here is that GEMS responded to the RFP that had been sent to it by Mr. Haven, not by Mr. Franzen.

GEMS also argues that the record is "replete with evidence" that Mr. Franzen discussed the RFP and GEMS's response to it, but it never cites anywhere in the record to support this allegation (*see* app. reply at 3). Without an actual citation to the record for us to review, we will not make any finding of undisputed material fact here – especially since GEMS does not tell us when these discussions supposedly took place or what they actually encompassed.

On July 6, 2018, a little more than a week after GEMS responded to Mr. Haven's letter, ACO Franzen sent a letter to GEMS as a follow-up to a discussion apparently held the day before, in which the Corps had informed GEMS that the June 18 letter from Mr. Haven had been sent in error, given the Corps' revised view that the contract had required the installation of the geofabric all along. Mr. Franzen's

---

[11] The GEMS response was addressed to Mr. Haven (ASBCA Nos. 62322-33 R4, tab 124 at GOVTO 16451).

letter also noted that Mr. Haven had not had the authority to impose costs on GEMS since he was not the CO. (ASBCA Nos. 62322-33 R4, tab 129 at GOVTO 16567). The letter did continue the offer, apparently made during the earlier meeting, to pay GEMS $3,000 to make up for the costs of assembling a response to the RFP – an offer that apparently did not satisfy GEMS when it was made (*id*. at GOVTO 16568).

On January 25, 2019, GEMS submitted a certified claim to the CO, seeking $164,294.31 and 38 days as the costs "for the time and effort of responding to" the RFP (ASBCA Nos. 62322-33 R4, tab 124 at GOVTO 16157). With the exception of providing the $3,000 previously mentioned, the CO denied the claim on December 18, 2019 (ASBCA Nos. 62322-33 R4, tab 2 at GOVTO 485). GEMS submitted a timely appeal to the Board, which we docketed as ASBCA No. 62327.

V. Facts Related to the Dispute Over Weed Mitigation at the Photovoltaic Array

The contract specifications required GEMS to obtain a "silver" LEED[12] rating (ASBCA No. 61831 R4, tab 8 at GOVTO 1521, ¶ 1.2). The contract specifications also require GEMS to conform to the "MOTCO Installation Design Guide," which was attached to the solicitation (*id*., ¶ 1.3). The MOTCO Installation Design Guide, in turn, included a number of "MOTCO landscape objectives," including one providing that the installation "Utilize plant materials and landscaping designs that require minimal maintenance and no irrigation" (*id*. at GOVTO 1456).

GEMS included a 40 KW photovoltaic solar array, measuring 113.25 feet by 36 feet, in its 100% design drawings. That array was located just outside of the general limits of the project. (ASBCA Nos. 61322-33 R4, tab 17.3 at GOVTO 9035)

The 100% design specifications produced by GEMS included Section 32 93 00 Exterior Plants (ASBCA Nos. 61322-33 R4, tab 17.9 at GOVTO 12274). Within this section was subsection 3, Execution, with subsection 3.1, Extent of Work, underneath that subsection. Subsection 3.1 provided in whole:

> Provide soil preparation, fertilizing, tree, shrub, and
> planting, edging, staking and guying, weed control fabric,
> and root control barrier installation and a mulch
> topdressing of all newly graded finished earth surfaces,
> unless indicated otherwise, and at all areas inside or

---

[12] We take judicial notice that LEED stands for "leadership in energy and environmental design," a rating system from the United States Green Building Council.

outside the limits of construction that are disturbed by the
Contractor's operations.

(*Id*. at GOVTO 12285)  The Corps approved the 100% design specifications on
January 20, 2017 (ASBCA Nos. 61322-33 R4, tab 18).

In July 2018, the parties exchanged correspondence reflecting a dispute as
to whether GEMS was obligated to install weed mitigation measures with the
photovoltaic array (*see* ASBCA Nos. 61322-33 R4, tabs 131-32).[13]  In a letter dated
July 27, 2018, responding to GEMS's assertion that it had no obligation to include
weed mitigation measures around the array, the CO argued that GEMS was required
to do so by the terms of the MOTCO Installation Design Guide and, accordingly,
directed GEMS to install weed mitigation under and around the photovoltaic array
(ASBCA Nos. 61322-33 R4, tab 132 at GOVTO 16924).

GEMS apparently complied with the government's demand and, on January 25,
2019, submitted a claim to the CO seeking $72,026.61 in compensation for the work
that it asserted was not required by the contract (*see* ASBCA Nos. 61322-33 R4,
tab 130 at GOVTO 16581).  In a decision that also encompassed other claims from
GEMS, the CO denied this claim on December 18, 2019 (*see* ASBCA Nos. 61322-33
R4, tab 2 at GOVTO 487).  GEMS submitted a timely appeal to the Board, which we
docketed as ASBCA No. 62328.

VI.  Facts Related to the Bollards Dispute

The contract required compliance with, among many other codes, United
Facilities Criteria (UFC) 3-201-1, "Civil Engineering" (*see* ASBCA No. 61831 R4,
tab 8 at GOVTO 1525-26).[14]  UFC 3-201-1, ¶ 2-6.4.1, Bollards around Structures,

---

[13] The facts set forth in this paragraph and the next were not included in the
government's motion, and though the motion makes allegations about what was
included in GEMS's claim, it provides no citation to the claim to support these
averments (*e.g.*, gov't mot. at 32).  Thus, to provide a complete explanation of
the history of this dispute, we were obliged to search for the information in the
record, ourselves.  We let it go in this instance because it was not prejudicial to
GEMS, and we judged it better to complete the task at hand, but doing the work
expected of the parties is not a good use of our time.

[14] The government did not cite the contract for this fact, but instead cited a letter which
made this assertion (*see* gov't mot. at 34 (citing ASBCA Nos. 61322-33 R4,
tab 134 at 4)).  Thus, we were required to search the 1067-page task order,
ourselves.  When a contract provision is cited to us, that citation should
generally be to the contract, itself, not to a secondary document.

provides, in relevant part, as follows: "Provide bollards around any structures subject to damage from vehicular traffic by incidental contract" (gov't mot. at Ex. C at 9).

The contract also required compliance with UFC 3-550-01, "Exterior Electrical Power Distribution" (*see* ASBCA No. 61831 R4, tab 8 at GOVTO 1527). UFC 3-550-02, ¶ 3-2, GENERAL ELECTRICAL REQUIREMENTS, provides in relevant part:

> Provide equipment foundation pads and ensure a minimum of 10 ft (3 m) clear workspace in front of pad-mounted equipment for hot stick work. Orient equipment so that adjacent equipment will not interfere with the clear workspace. Provide bollards in areas where equipment is subject to vehicular damage.

(Gov't mot. at Ex. D, p. 5)

Although the government states in its motion that a switchgear and air compressor lay within the site extent shown in contract drawings, and cited Sheet C-120 of those drawings to support that assertion (*see* gov't mot. at 34-35 (citing ASBCA No. 61831 R4, tab 8 at GOVTO 2011)), the drawings cited do not depict the switchgear or air compressor for us to be able to support that conclusion. Similarly, we are unable to find support from the drawings cited to support the government's assertions that GEMS was required to place asphalt adjacent to the air compressor and the switchgear (*see* gov't mot. at 35 (citing ASBCA No. 62322-33 R4, tab 17.3 at GOVTO 9035)) or that no curb separated the asphalt that GEMS installed around the compressor and the switchgear from the adjacent Portland cement area (*see id.*).

GEMS's program manager observed vehicles driving near the portion of the building where the air compressor was located and agreed that there was nothing preventing a truck from accidentally striking it (gov't mot. at ex. E at 48:13-49:22).

Apparently, the Corps directed GEMS to install bollards to protect the switchgear and the air compressor. GEMS objected, though it complied with the government's direction and subsequently submitted a claim to the CO, seeking $30,319.08 in compensation for the extra cost and a day of delay (ASBCA Nos. 62322-33 R4, tab 133 at GOVTO 16927). On December 19, 2019, the CO denied this claim in a decision that also encompassed other claims from GEMS (*see* ASBCA Nos. 61322-33 R4, tab 2 at GOVTO 487-89).

GEMS's scheduling expert has testified that GEMS is entitled to no delay days as a result of being required to install the bollards (gov't mot. at Ex. A at 17:5-10).

15

GEMS submitted a timely appeal to the Board, which we docketed as ASBCA No. 62329.

### VII. The Interest Claim

On November 20, 2015, the Corps issued the notice to proceed letter that set the end of the performance period at March 31, 2017 (ASBCA Nos. 62322-33 R4, tab 6). After various contract modifications, on May 4, 2017, the contract completion date was extended to September 7, 2017, by bilateral modification (ASBCA Nos. 62322-33 R4, tab 9).

On May 15, 2017, the CO sent a letter to GEMS informing it that it had begun retaining 10% of its progress payments to GEMS as a consequence of the project's then being scheduled to be completed on November 10, 2017, 64 days after the contractually-fixed completion date of September 7, 2017. According to the letter, the 10% retainage would continue until the amount withheld equaled the liquidated damages that would be due: $170,768. (ASBCA Nos. 62322-33 R4, tab 25 at GOVTO 12449)

The project was not completed on November 10, 2017, and retainage on the progress payments continued. According to a later claim submitted by GEMS (discussed immediately below), the Corps withheld a total of $440,463[15] in payments from GEMS through October 18, 2018 (ASBCA Nos. 62322-33 R4, tab 141 at GOVTO 18886). Through a government claim by the CO issued on December 18, 2019[16], the Corps would assert that it was entitled to $954,460 in liquidated damages for the unexcused late completion of the project by 380 days at the contractual rate of $2,512 per day (ASBCA Nos. 62322-33 R4, tab 2 at GOVTO 444, 467).

GEMS had, prior to then, submitted its own claim related to the retainage. In this claim, submitted on January 25, 2019, GEMS argued that, pursuant to the Prompt Payment Act,[17] it should be entitled to interest upon the retained money in an amount it calculated to be $21,0428.48 (ASBCA Nos. 62322-33 R4, tab 141 at GOVTO 18878).

---

[15] The government's liquidated damages claim puts this figure at $421,903.02 (ASBCA Nos. 62322-33 R4, tab 2 at GOVTO 446). We need not resolve the discrepancy to decide the pending motion.

[16] This was the same document that also decided a number of other claims submitted by GEMS.

[17] The body of the claim references "prompt payment," but not the Prompt Payment Act, *per se* (*see* ASBCA Nos. 62322-33 R4, tab 141 at GOVTO 18878-79). Nevertheless, GEMS's supporting calculations utilized the Prompt Payment Act's interest rate (*see id*. at GOVTO 18889-90).

The CO denied GEMS's interest claim in its entirety in the final decision dated December 18, 2019 (ASBCA Nos. 62322-33 R4, tab 2 at GOVTO 493). GEMS submitted a timely appeal to the Board, which we docketed as ASBCA No. 62332.

## DECISION

### I. Standards for Considering Motions for Summary Judgement

The standards for summary judgment are well established and need little elaboration here. Summary judgment should be granted if it has been shown that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). Nevertheless, "[t]he moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

In cases, such as the one here, where the parties present cross-motions for summary judgement, ruling against one party is not the same as ruling for the other. When considering cross-motions for summary judgment, we "evaluate each motion on its own merits, taking care in each instance to view the evidence in favor of the non-moving party." *Almanza v. United States*, 935 F.3d 1332, 1337 (Fed. Cir. 2019) (citing *Anderson*, 477 U.S. at 255).

### II. Neither Party is Entitled to Full Summary Judgment on the Driveway Claims

As will be demonstrated below, the contract clearly required that GEMS design and build a driveway connecting the project to "A" Street. What was not so clear, however, were the dimensions of that driveway and what GEMS should have been reasonably expected to design and build based on the very sparse directions included in the contract. Because of this, although both parties have requested summary judgment on these claims, neither can prevail at this stage in the proceedings.

#### A. The Contract Required GEMS to Design and Build a Driveway Entrance on "A" Street

Whether a driveway is required is fundamentally an issue of contract interpretation. And, of course, contract interpretation begins with the terms of the contract. If they are unambiguous, our inquiry starts and stops there. *See Teg-Paradigm Envt'l, Inc. v, United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). In addition to the usual rules of textual interpretation, such as reading the contract "as a whole and [interpreting it] to harmonize and give reasonable meaning to all its parts," if possible, leaving no words "useless, inexplicable, inoperative, insignificant, void, meaningless or superfluous," *see, e.g., Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922 (citations omitted), we also consider one not often raised in cases before us but which is helpful here: the presumption of consistent usage.

The presumption of consistent usage is most commonly seen as a tool of statutory interpretation. It is the common-sense notion that, in general, "identical words used in different parts of the same statute are generally presumed to have the same meaning." *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) (citing *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990)). As noted, we generally find this canon of construction utilized to interpret statutes, but there is no reason it should not be appropriately applied in constructing contracts, which is a similar textual interpretation chore. Indeed, the Federal Circuit uses a similar tool of textual construction in construing patent claims, stating that "a word or phrase used consistently in a claim should be interpreted consistently." *Phonometrics Inc. v. Northern Telecom*, 133 F.3d 1459, 1465 (Fed. Cir. 1998).

A review of the contractual documents makes clear that they required GEMS to design and build the driveway. Specifically, as noted above, section 6.7.4 of the specifications, **Vehicle Access**, provided that "One driveway entrance shall be provided on 'A' Street. See sheet C-120." And, as also noted above, regardless of what is or is not in the drawings, GEMS was instructed by FAR 52.236-21, which was incorporated into the contract, that the specifications governed the drawings in the event of any conflict.

GEMS argues that the phrase "shall be provided" means that the government was going to provide the driveway (app. mot. at 2), but that is not a proper interpretation of this phrase as used in the contract. The exact same "shall be provided" phrase was used in the immediately preceding section of the specifications, 6.7.3, regarding the 10 parking spaces required by the contract, and there is no dispute that these did not exist at the time of the contract award (*see* sheet C-101, the demolition drawings, reproduced above, which do not reflect their existence) and would thus need to be designed and built by GEMS. Applying the rule of consistent

18

usage, we thus conclude that Section 6.7.4 of the specifications required GEMS to design and build the driveway connecting the project to "A" Street.[18]

### B. But There Is Dispute Over the Contract's Driveway Size Requirements

GEMS argues that even if the driveway were required by the contract, the Corps was not entitled to make arbitrary choices about how large it would be and the kinds of trucks it would be expected to support (app. mot. at 2, 4). This argument has more traction and precludes summary judgment for the government.

We have reviewed the government's motion and the record in vain in a search for information setting forth the design parameters of the driveway. Thus, we presently do not have before us evidence of the undisputed material facts needed for the government to prevail, namely, evidence that the terms of the contract (including, but not limited to, those which set forth the intended use of the facility) established minimum parameters of the driveway consistent with those imposed by the Corps during performance.[19]

Turning first to the design claim: having found that GEMS was required to design and build a driveway, we find it difficult to fathom how GEMS could claim entitlement to the design costs it seeks here. Difficult, but (for the purposes of summary judgment) not impossible. GEMS could potentially provide proof that it was more expensive to design the driveway that the Corps said it wanted during performance than a driveway that would have met the requirements of the contract. If so, it will prevail. If it does not, the government will win. Accordingly, we deny summary judgment to both parties on this claim.

With respect to the construction claim, we are again presented with a case in which the undisputed material facts do not allow us to hold (for now) that the driveway that the Corps demanded during performance was one that was required by

---

[18] The government's reply brief provides additional examples of "shall be provided" in the contract that are also consistent with our interpretation here (*see* gov't reply at 6). These all support our conclusion, though we find the parking spaces example to be the most persuasive because it immediately precedes the driveway specification.

[19] Among other things, the government argues that GEMS's subcontractor knew enough from the contract documents to produce a site plan that wound up being the one ultimately adopted (gov't reply at 9). This may well be a persuasive argument at the hearing, but, given the way we must consider evidence at the summary judgment stage, without more, it is not enough to support a finding, as an undisputed fact, that the contract sufficiently defined the needs of building so as to match what the Corps demanded during performance.

19

the contract. Again, the present factual development of the case before us precludes us from granting summary judgment to either side.

## C. Yet, GEMS Is Entitled to No Delay Claims for the Driveway Design

A final matter regarding the driveway design claim is that GEMS has effectively conceded that it is not entitled to delay damages for the driveway design. Accordingly, we deny the portion of GEMS's appeal seeking delay damages for the driveway design requirement.

## III. The Sovereign Acts Doctrine Precludes Recovery for GEMS Upon Portions of the Security Access Appeal

Under the sovereign acts doctrine, the United States is immune from liability for "obstruction of the performance of [a] contract resulting from its public and general acts as sovereign." *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1574 (Fed. Cir. 1997) (quoting *Horowitz v. United States*, 267 U.S. 458, 461 (1925)); *see also APTIM Fed. Servs., LLC*, ASBCA No. 62982, 22-1 BCA ¶ 38,127 at 185,218. The general notion of the doctrine, as Justice Souter explained in his concurrence in *United States v. Winstar Corp.*, 518 U.S. 839, 896 (1996), is to draw a line between the circumstances when an act is "relatively free of Government self-interest," in which cases the doctrine applies to the benefit of the government, and those circumstances where the action is "tainted by a governmental object of self-relief." *See also Conner Bros. Constr. Co., v. Gerren*, 550 Fed. Cir. 1368, 1373-74 (Fed. Cir. 2008) (quoting Justice Souter's concurrence and noting that, despite being a mere concurrence, it is considered by the Federal Circuit to set forth the "core principles" of the sovereign acts doctrine).

The separate decisions by the Pass and ID Office at MOTCO to change its procedures for issuing passes – both phasing out the DBIDS system and requiring greater advanced notice prior to issuing passes – fit squarely within the sovereign acts rubric. On their face, they are aimed at all visitors to the installation, concern a quintessential government function (installation security), and are not to the government's benefit as a contracting party.

In opposition to the government's motion (GEMS makes no cross-motion for summary judgment here), GEMS makes a number of unpersuasive arguments: first, it alleges that the government had not proved that the changes applied to "the public, rather than merely to contractors" because there might not be any non-contract visitors to MOTCO. Second, apparently relying upon *APTIM*, GEMS argues that for the sovereign acts defense to apply, the government action must make performance of the contract impossible, not merely difficult, as was the case here. Finally, GEMS argues that the sovereign acts doctrine only addresses actions or inactions by the Pass and ID

20

Office, and not by the Corps – though it does not specify what actions or inactions on the part of the Corps are the "viable basis for a claim" that it alleges it possesses. (App. mot. at 4-5)

GEMS's first argument misapprehends the application of the defense. First, of course, the terms of the changed access rules, on their face, apply to all visitors – not just contractors. GEMS's suggestion that, *de facto* (it does not use that phrase), all visitors to MOTCO are contractors, is made without proof. In any event, the "public and general act" of the sovereign may, in fact, apply only to contractors or even a single contractor. This was exactly what happened in *Conner Bros.*, *supra*, and in holding that the defense applied, the Federal Circuit explained that the defense "does not rest on a mechanical determination of the number of contractors affected, but rather focuses on the nature and scope of the governmental action." *Conner Bros.*, 550 Fed. Cir. at 1377. The nature and scope of the government action here was plainly directed to the manner in which the Pass and ID Office would perform its duties and there is no evidence or reason to believe that it was aimed at relieving the Corps of its contractual duties to GEMS. This argument fails.

With respect to the impossibility argument, as the government correctly argues, this, too, is a misunderstanding of the law (*see* gov't reply at 15-16). To be sure, GEMS does accurately cite *APTIM* for the proposition that one element of the sovereign acts defense is that the government action "must render performance of the contract impossible" (*see* app. mot. at 4, *citing APTIM*, 22-1 BCA ¶ 28,127 at 185,218[20]), but that portion of *APTIM* is stripped of context. *APTIM* is citing *American General Trading & Contracting WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905, and *Conner Bros* for this proposition, but neither case requires that compliance with the entire contract be impossible. Moreover, in *APTIM*, the circumstances involved the temporary closure of a military base to non-essential personnel during the height of the COVID epidemic. After that closure was lifted, the contractor was able to resume performance of the contract, but sought damages, which were ultimately precluded after application of the defense.

The better way to read the talk of impossibility in the cases is that, to the degree the government does not comply with its contractual obligations, its failure to do so is because of the sovereign act making such full compliance impossible; not, as GEMS would have it, that the defense is only available when the sovereign act complained of utterly destroyed the contractor's ability to perform. All that is required is "obstruction of . . . performance" caused by the sovereign act, *see Yankee Atomic*, 112 F.3d at 1574, and just as we would perceive no purpose served by limiting a

---

[20] GEMS's brief does not include this pinpoint citation to *APTIM*, which we would generally expect, though we understand that not all legal research services provide pagination for our cases.

contractor's ability to recover damages from the government to those circumstances when it was impossible to perform the contract at any cost, we perceive no purposes in interpreting the sovereign acts doctrine in the cramped manner advanced by GEMS here.

With respect to GEMS's final argument, we believe it misperceives the scope of the government's motion, which is only for *partial* summary judgment and is limited to the actions of the MOTCO Pass and ID Office in phasing out the DBIDS cards and increasing the time period for action to seven working days (*see* gov't mot. at 23).[21] Accordingly, we rule for the government for the portion of appeal number 62331 specified in its partial motion: the phase out of DBIDS cards and the increase in advance notice required. Complaints about delays caused by Corps actions or inactions remain for the time being.

IV. <u>We Grant the Government Summary Judgment on the Weed Geofabric RFP Request Issue</u>

There are two somewhat independent issues that form the bases of the government's demand for summary judgement. First, in general, is whether the government is liable for the cost of complying with a request for proposal, which both it and GEMS at one point believed to be necessary and then the government determined was not, since the work (by the government's lights) was already required by the contract. Second is whether GEMS can recover under this theory when the individual issuing the RFP was not the contracting officer. (*See* gov't mot. at 26-27).

We turn first to the issue of the government's liability for issuing an RFP that it later found to be unnecessary. Neither party has provided us any binding law directly on point, but the primary case cited by the government, *Blake Const. Co.*, VABCA No. 1725, 83-1 BCA ¶ 16,431 (*see* gov't mot. at 26), crystallizes a general rule, resting in part upon a number of decisions of ours and other boards of contract appeals and which strikes us as reasonable and which we hereby adopt:

> . . . [W]hen a contracting officer requests documentation on a proposed change be prepared, the "general rule is that a contractor is not entitled to be reimbursed for the costs of preparing such documentation if the change is not later ordered." NASH, GOVERNMENT CONTRACT CHANGES (1975), 180

---

[21] Arguably, those were the only issues actually raised by GEMS's claim and we would not possess jurisdiction to consider anything else that might be in GEMS's complaint, *see, e.g., Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003), but the government does not make that argument today.

> There are exceptions to this general rule, of course . . .
> Decisions allowing compensation, while not always fitting
> neatly into a coherent legal theory have one or more of the
> following elements present: first, these Board decisions
> usually find a strong element of government compulsion
> which alters the traditionally "voluntary" nature of the
> contractor's efforts. *Century Engineering Corp.*, ASBCA
> No. 2932, 57-2 BCA ¶ 1419. Second, the contractor has
> usually expended significant efforts or incurred substantial
> costs beyond that which would normally be contemplated
> with regard to a proposed change order. *Harman-B.J.
> Gladd Construction Co.*, VACB No. 1093, 75-1 BCA
> ¶ 11,262. Third, the proposed change is often intended to
> correct a government error. *Baltimore Contractors, Inc.*,
> GSBCA No. 3425, 72-2 BCA ¶ 9622; *Acme Missiles &
> Construction Corp.,* [ASBCA No. 11786, 69-2 BCA
> ¶ 8,057].
>
> If a principle may be articulated from the foregoing, it is
> that costs of preparing unadopted proposals will not be
> separately compensated unless the contractor is compelled
> to undertake extensive and costly efforts which exceed the
> parties' contemplation.

83-1 BCA ¶ 16,431 at 81,739-40.

GEMS gives us no reason to question this rule, relying, too, on a VABCA case which, itself, cites this rule (*see* app. mot. at 6, citing *Bridgewater Constr. Corp.*, VABCA No. 2935, 91-3 BCA ¶ 24,274 at 121,358[22] (citing *Blake Construction*)). Indeed, because this has been the unchallenged view of the law for the last 40 years, prudential concepts of uniformity and long-held expectations of the contracting parties only strengthen our inclination to adopt this rule.

With this rule in hand, it is easy enough for us to find for the government. Nothing about the RFP and the circumstances surrounding it appears to be particularly onerous or demanding by the government. Yes, as GEMS noted, the language of the RFP used the word "shall" in describing GEMS's need to respond and provided that GEMS could not proceed on "additional" work contemplated by the RFP until it was

---

[22] GEMS does not include this pinpoint cite, but it appears to be where its citation is coming from.

approved (*see* app. opp. at 6), but that is rather standard RFP language that makes this particular RFP no more coercive than the norm. More importantly in our circumstances, the scope of the RFP is relatively trivial compared to the balance of the contract – this is not the kind of "extensive and costly effort" that exceeds the usual expectations in performance of the contract which is necessary to support departure from the usual rule. *See Blake Construction*, 83-1 BCA ¶ 16,431 at 81,739. To be sure, GEMS now seeks the eye-popping amount of $164,294.31 for the time and effort of responding to this RFP, but the actual cost proposal it provided in response to the RFP sought only $18,783.95, indicative of a far more modest and routine effort on its part, and GEMS has simply provided us with no evidence supporting a finding of material facts indicating that there was an extensive and costly effort here. GEMS is entitled to no compensation on appeal number 62327 and thus we grant the government's motion and deny GEMS's cross-motion.[23]

Having come to the conclusion above, we need not reach the issue of Mr. Haven's authority to issue the RFP (an argument not particularly well developed by the parties), which is not to say that we do not entertain significant doubts that he possessed the authority to bind the government in an endeavor that would impose costs on GEMS. We do note, however, that Mr. Haven's issuance of the RFP and GEMS's going along with it, with neither party feeling the requirement to wait for the CO, support our determination above that the government's issuance of this particular RFP in the course of contract performance was not perceived as the imposition of an expensive and costly effort upon GEMS.

   V. <u>We Deny Summary Judgment on the Weed Mitigation Dispute at the Photovoltaic Array</u>

Although it is evident to us that Subsection 3.1 of the Exterior Plants portion of the design specifications required weed mitigation measures for "newly graded finished earth surfaces" and "areas . . . disturbed by [GEMS's] operations," the government has simply provided no evidence that the area surrounding the photovoltaic array where it required those weed mitigation measures to be undertaken was, in fact, disturbed. Indeed, we do not know what the surface the array was placed upon consisted of. GEMS, for its part, has not provided any evidence to support a finding that soil was not disturbed by the installation of the array, nor has it proved the other basis for its cross-motion, which is that the area where the photovoltaic array was installed was not subject to the contract's weed mitigation requirements (*see* app. mot. at 8). Though common sense and our experience in projects like the one here

_____

[23] We note that GEMS's cross-moved for summary judgment on this issue, but the basis for its motion rests upon the notion that general rule regarding RFP response costs is inapplicable here (*see* app. mot. at 5-7), which we found mistaken above.

certainly suggest a high likelihood that the government is correct and the area covered by the government's directive was so disturbed, we cannot make that determination at this point and thus deny summary judgment to both parties.

VI.  We (Mostly) Deny Summary Judgment on the Bollards Dispute

For reasons similar to those precluding summary judgment in the photovoltaic array weed control dispute, we cannot grant summary judgment for the bollards dispute.  This is largely a result of the lack of clarity in the record before us.

To be sure, the contract requires the placement of bollards in areas where electrical equipment is subject to damage from vehicles, but, as we found above, the contract drawings cited by the government do not depict where the switchgear and air compressor are, nor do they demonstrate that there was asphalt adjacent to them.[24] Without such information, we cannot draw conclusions about whether these pieces of equipment are, in fact, subject to such damage.  Thus, the government is not entitled to the complete summary judgment it seeks.  Likewise, GEMS's request for summary judgment in its favor, founded primarily upon the assertion that, if the terms of the contract were interpreted in the broadest possible sense, everything would need to be protected by bollards (*see* app. mot. at 9-10), is not particularly persuasive – especially given our lack of knowledge of the actual location here.  It, too, is denied.

We do grant partial summary judgment in favor of the government on the basis of the one day of delay sought by GEMS for this claim that its expert testified was unsupportable and which GEMS does not argue.  That small portion of this appeal is denied.

VII.  We Grant Summary Judgment to the Government on the Interest Claim

The question before us on this appeal has been answered before:  is a contractor entitled to Prompt Payment Act interest when the government withholds money as retainage due to project delays?  The answer is no.

It is well settled that, absent a waiver of sovereign immunity, the United States is not liable to pay interest to a litigant.  *See, e.g., England v. Contel Advanced Sys., Inc. v. United States*, 384 F.3d 1372, 1379 (Fed. Cir. 2004) (citing *Library of Congress v. Shaw*, 378 U.S. 310, 321 (1986)).  The waiver of sovereign immunity averred here by GEMS is the Prompt Payment Act, 31 U.S.C. § 3901, *et seq.* (PPA).  But the PPA does not require payment of interest to a contractor, like GEMS, when there is "a

_____

[24] It is certainly plausible that witness testimony could clear this up, but in the absence of such aid, we have been unable to make this determination by our unassisted review of the plans.

dispute between the head of the agency and a business concern over the amount of payment or compliance with the contract." 31 U.S.C. § 3907(c). When such a dispute is involved, the PPA directs the reader to chapter 71 of title 41, *id*., which is the Contract Disputes Act (CDA). The interest provision of the CDA provides that interest shall be paid from the date of the submission of the claim to the contracting officer. 41 U.S.C. § 7109(a).

There have been a number of decisions from the Court of Federal Claims that have addressed the issue of PPA interest when the government has withheld or partially withheld progress payments from a contractor because of retainage or a dispute about contract compliance. Though these decisions are not binding upon us (only decisions of ours, the Federal Circuit and its predecessor courts, or the Supreme Court are), they do constitute persuasive authority. Moreover, they do reflect a consensus that no PPA interest is due when payment is being withheld as a consequence of a dispute between a government agency and a contractor. *See, e.g., LCC-MZT Team IV v. United States*, 155 Fed. Cl. 387, 518-520 (2021) (collecting cases); *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 304 (2005) (even if equitable adjustment later found appropriate, the government's initial dispute of entitlement to payment precludes PPA interest). To that end, at least one of our decisions took this rule for granted without seeing a need to provide a deep legal justification for it. *See Versar, Inc.,* ASBCA No. 56857 *et al*, 12-1 BCA ¶ 35,025 at 172,126-27. Lest there be any confusion, consistent with the uniform application of the law elsewhere (and GEMS has pointed us to not a single contrary case), we hold that when the government withholds payment upon a contract because of a dispute about entitlement to the amount requested, the contractor is not entitled to PPA interest, even if the dispute is later resolved in the contractor's favor.

Given that the undisputed evidence[25] is that the CO withheld retainage on account of the liquidated damages the government expected to assess against GEMS,

---

[25] In its one-paragraph response to the portion of the government's motion on this issue, GEMS argues that the government must prove a "legitimate dispute" to avoid PPA interest, but cites no law for the "legitimate" qualifier (*see* app. mot. at 10). Moreover, even if that were the law, GEMS has provided no evidence, whatsoever, that the dispute here was anything but "legitimate" and, in the absence of clear and convincing contrary evidence, we do presume that the CO, like all government officials, acts in good faith. *E.g., Road and Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368 (Fed. Cir. 2012) (citing numerous cases).

this withholding was not subject to PPA interest and we grant summary judgment in the government's[26] favor on the Interest Claim, ASBCA No. 62332.

## CONCLUSION

For the reasons discussed above:

We deny the parties' cross motions for partial summary judgment on ASBCA No. 61737, the driveway design claim, except to the extent we grant the government's motion by denying the portion of the appeal seeking delay damages.

We deny the parties' cross motions for summary judgment on ASBCA No. 62785, the driveway construction claim, except to the extent that we grant the government's motion by denying the portion of the appeal seeking delay damages.

We grant the government's partial motion for summary judgment on ASBCA No. 62331, the security access claim, denying all portions of the appeal except those alleging actions by the Corps in delaying approval of base access to GEMS that took more time than set forth by the MOTCO Pass and ID Section's procedures.

We grant the government's motion for summary judgment and deny GEMS's cross motion for ASBCA No. 62327, the weed geofabric RFP claim. This appeal is denied.

We deny the parties' cross motions for summary judgment for ASBCA No. 62328, the claim involving weed geofabric at the photovoltaic array.

We deny the parties' cross motions for summary judgment for ASBCA No. 62329, the claim involving the bollards, except to the extent that we grant the government's motion to deny the portion of the appeal seeking a delay day.

---

[26] GEMS does not explicitly seek summary judgment in its favor on this issue. If it did, we would deny the motion for the same reason that we grant the government's.

We grant the government's motion for summary judgment and deny GEMS's cross motion for ASBCA No. 62332, the interest claim. This appeal is denied.

Dated: July 2, 2024

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61737, 61831, 62322, 62323, 62324, 62325, 62326, 62327, 62328, 62329, 62330, 62331, 62332, 62333, 62785, 62786, 62787, Appeals of GEMS Environmental Management Services, rendered in conformance with the Board's Charter.

Dated: July 2, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals